UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/3/24
```

————————————————————————x

In re: SEARS HOLDINGS CORPORATION,
et al.,

                                   Debtors.

MOAC MALL HOLDINGS LLC,

                                 Appellant,               No. 19 Civ. 09140 (CM)

    -against-

TRANSFORM HOLDCO LLC and
SEARS HOLDINGS CORPORATION, et al.

                                 Appellees.

————————————————————————x

## DECISION AND ORDER DISMISSING APPEAL
## AS MOOT FOR LACK OF REMEDY

McMahon, J.:

      This matter has been returned to the Court it left over four years ago for an assessment of

whether the appeal should be dismissed for lack of any remedy -- notwithstanding the Second

Circuit's affirmance of this Court's February 27, 2020 order, which vacated the assumption and

assignment of the lease on the Sears Roebuck premises at the Mall of America in Minneapolis (the

"Lease"). As I conclude that there is no available remedy beyond that vacatur, I direct that the

order vacating the assumption and assignment be reinstated; order the Lease returned to the

possession of the Sears Liquidating Trustee; and dismiss MOAC's appeal as moot for lack of any

further remedy.

## FACTS & PROCEDURAL HISTORY

**The Bankruptcy Proceedings**

The tortured history of this case represents the antithesis of what a bankruptcy is supposed to be: a relatively quick and comprehensive resolution of a debtor's issues with its creditors.

The iconic retailer Sears filed for bankruptcy in October 2018. It had leases on hundreds of properties throughout the United States; its real estate holdings were a principal, if not the principal, asset of a corporation whose retail businesses had been spiraling downhill for years. One of those leases was at the Mall of America in Minneapolis.

Sears was an original anchor tenant at Mall of America. It negotiated an extremely favorable lease – indeed, for a retail store, an almost unheard-of lease – in exchange for anchoring the new mall and building its store at its own expense. The unusual terms of the lease are summarized in the previous opinions of this and other courts. *See, e.g., MOAC Mall Holdings LLC v. Transform Holdco LLC (In re Sears Holding Corp.)*, 613 B.R. 51, 56-58 (S.D.N.Y. 2020) ("*Sears I*"). Among the most salient of these terms was the length of the lease – 100 years – at an annual compensation package consisting of $10 in rent (which was prepaid through 2021 at the time the Lease was signed (*see* Bankr. Dkt. No. 3927, Ex. A, APX2199 ("Lease") ¶ 21.1)[1]), plus liability for taxes, insurance and common charges, but with no obligation to pay percentage rent. This effectively capped the total rent due for this massive property at somewhere in the neighborhood of $1 million to $1.2 million per year. (*See* April 10, 2024 Hr'g Tr. at 39:7-8).

---

[1] "Bankr. Dkt. No. __" refers to docket entries in the Bankruptcy Court, No. 18-23538. "APX__" refers to the Appendix filed by Appellant MOAC. *See* Dist. Dkt. No. 17. "Dist. Dkt. No. __" refers to docket entries in the above-captioned case.

Another highly unusual feature of the Lease was that Sears had the absolute right to "go dark" (close the store) after completing 15 years of operation (which occurred in 2007), at which point it was free to sublease any portion of its space – and even to assign its lease without the consent of the landlord (MOAC) or any other tenant in the Mall, including the other anchor tenants – for virtually any conceivable use, as long as that use (1) did not qualify as illegal or a nuisance or (2) would cause the space to be used "primarily" for offices. In most shopping center leases, the landlord retains veto power over the assignment of tenant leases. *See Retail Lease: Key Provisions*, Practical Law Practice Note 4-507-0793 (Westlaw 2020) ("Retail leases usually contain explicit restrictions on a tenant's ability to assign its lease or sublease its premises to third parties. These provisions typically provide that the landlord's consent is required before an assignment or sublease."). They certainly do not allow tenants to cease operations and leave a massive space unoccupied for three quarters of a century. Yet Sears could do precisely that, in exchange for constructing the space in the first place.

In February 2019, an entity called Transform Holdco LLC ("Transform" or "Holdco") paid a substantial sum[2] to purchase substantially all of Sears' assets, including its real estate, in the bankruptcy. Transform was the creation of former Sears executives, who wanted to capture for themselves the value of Sears' many substantial assets. Transform Holdco's subsidiary, Transform Leaseco, was, as its name suggests, formed for the purpose of leasing, rather than operating, properties owned by Sears. The Asset Purchase Agreement ("APA") between Sears and Transform

---

[2] I have read that Transform paid both $1.4 billion and $4.6 billion, in different documents. My understanding is that Transform agreed to pay about $1.4 billion in cash and assumed billions of dollars in Sears' liabilities. Whatever, Transform paid a lot of money to acquire a lot of things – the Sears lease at Mall of America being just one of them.

was approved by order of the Bankruptcy Court, which issued after a § 363(b)[3] sale. (Bankr. Dkt. No. 2507, APX87 ("Sale Order")).

Among the bundle of assets purchased by Transform pursuant to the APA were (1) certain specifically "Assigned Agreements," and (2) "Designation Rights" for contracts identified as "Designatable Leases." (*Id.* at 3). "Designation Rights" are the right to designate to whom a lease between Sears (or an affiliate, such as Kmart) and some landlord should be assigned. Because Transform had purchased Designation Rights, once it identified an assignee, Sears was required, per the terms of the APA, to assume the designated lease and then assign it to Holdco's chosen assignee, subject to certain conditions specified in the APA. (Sale Order, Ex. B, APX184, *as amended by* Bankr. Dkt. No. 2599, Ex. F, APX3593 ("APA") § 2.6).

All told, there were hundreds of "Designatable Leases," one of which was Sears' lease at the Mall of America. Transform intended to continue to operate about 425 of those properties as Sears or Kmart stores. It planned to use its Designation Rights to bring about the assignment of the rest of the Designatable Leases to itself (through an affiliate, such as Transform Leaseco), and then to sublease the spaces covered by those leases to new tenants at what it hoped would be a handsome profit.

Pursuant to § 2.6 of the APA, Transform Holdco purchased the Designation Rights for all Designatable Leases on the closing date. (*Id.*) Its right to designate assignees for all those leases vested upon the closing of the APA. (*Id.* §§ 2.6, 5.2(a)). But the APA made clear, "For the avoidance of doubt, the sale . . . of the Designation Rights provided for herein on the Closing Date

---

[3] Unless otherwise noted, section numbers refer to sections of the Bankruptcy Code, Title 11 of the United States Code.

*shall not effectuate a sale, transfer, assignment or conveyance of any Designatable Lease to Buyer [Transform] or any other Assignee . . . ."* (*Id.* § 2.6 (emphasis added)). Any such "sale, transfer, assignment or conveyance" would only occur on something called the "Designation Assignment Date" – defined in the APA as the date of the "sale, transfer, assignment, conveyance and delivery" of the designated lease by Sears to Holdco's designee. (*See id.* §§ 2.6, 5.2(d)).

The APA also specified precisely when and how Sears' interest in any individual Sears lease would pass to Holdco's designee:

> On each Assumption Effective Date,[4] pursuant to section 365 of the Bankruptcy Code and the Approval Order, Sellers shall assume and assign to the applicable Assignee any Designatable Lease so designated by Buyer for assumption and assignment in accordance with the terms of this Agreement, and Buyer shall pay all or be responsible for Cure Costs with respect to such Designatable Leases.

(*Id.* § 2.7(c)). Transform's payment of cure costs was required because Sears could only assume a lease with the consent of the Bankruptcy Court, and the Code sets out numerous preconditions to obtaining such approval – including a requirement that existing defaults be cured, or assurance of prompt cure be provided, before a debtor may assume a lease. *See* 11 U.S.C. § 365(b).

Certain leases were assigned to Holdco as designee simultaneously with the closing of the APA and Holdco's acquisition of Designation Rights. (*See* APA § 2.7(b)). On or around April 2, 2019, Judge Drain entered an order establishing a procedure for Holdco to follow when exercising its Designation Rights for other Designatable Leases. (Bankr. Dkt. No. 3008, APX1290). Once Holdco identified an additional lease to be designated for assumption and assignment, the Debtors (Sears) were to file a notice (not a new motion) with the court. Any party objecting to such

---

[4] With respect to designatable leases to which objections to designation were lodged – such as the Lease before this Court – this date is defined as "the fifth (5th) Business Day following the date of resolution of any objection to assumption and assignment of such Lease." *Id.* § 1.1 ("Assumption Effective Date"). In the case of the Mall of America Lease, the Designation Assignment Date and the Assumption Effective Date were the same day.

assignment had to serve and file a written objection with the Bankruptcy Court eight days after the filing of (i) the notice, or (ii) evidence that the assignee could provide adequate assurance of future performance pursuant to § 365(b)(3) -- whichever was later. (*Id.*) MOAC raised no objection to this procedure.

Two weeks later, on April 19, 2019, Holdco filed a notice of "additional designatable leases" for assignment to itself or an affiliated entity. (Bankr. Dkt. No. 3298, APX1331 (the "Notice")). Among the additional designated leases was the MOAC Lease. Holdco designated its affiliate, Leaseco, as the assignee of that particular lease. As one might surmise from the name of Holdco's designee, Transform intended to market the MOAC Lease to a new tenant or tenants not yet identified. One thing was clear: the parties have stipulated that Holdco had no intention of operating a Sears store at the Mall of America. (Bankr. Dkt. No. 4865, APX1780 ("Aug. 16, 2019 Stip.") ¶¶ 11-14).

Transform sought to have Sears assume the Lease and assign it to Leasco in accordance with § 365 -- the section of the Code applicable to executory contracts and unexpired leases. All parties -- Transform, MOAC and Sears -- repeatedly stipulated that the Mall was a "shopping center" (*see* Bankr. ECF No. 4354, APX 4176 ¶ 4; Bankr. ECF No. 4687, APX 4186 ¶ 4), and in one instance further stipulated that the contract between MOAC and Sears was a "shopping center lease" within the meaning of § 365(b)(3) of the Bankruptcy Code. (*See* Aug. 16, 2019 Stip. ¶ 6). In support of its motion for assumption and assignment (embodied in the Notice), Transform argued that it had satisfied the special and more onerous requirements for assignment of a shopping center lease, which are found in that section of the Code. In particular, it argued that it had provided adequate assurance of future performance requirements for shopping center leases, which are found in § 365(b)(3)(A)-(D). (*See, e.g.*, Bankr. Dkt. No. 3654, APX 1378, at 12-23).

MOAC objected to the Notice on the ground, among others, that the Debtors had not demonstrated that Leaseco met the special statutory qualifications for assignment of a shopping center lease that are contained in § 365(b)(3). (Bankr. Dkt. No. 3501, APX1344). Over the course of the next few months, MOAC filed additional objections to the designation. MOAC's objections, and the response of Transform and the Debtors thereto, were made in full compliance with the procedure adopted by the Bankruptcy Judge for dealing with lease assumptions and assignments. Sears itself did not file any notice of intent to assume the MOAC Lease with the Bankruptcy Court which it was supposed to do per Judge Drain's order. But the learned Bankruptcy Judge had already entered an order that compelled the Debtor, pursuant to the APA, to assume any lease that was designated by Holdco. MOAC has never objected to Judge Drain's procedural order, or to the designation on the ground that Holdco, rather than Sears, filed the notice. Therefore, Holdco's filing of the notice was the equivalent of Sears' making a motion to assume the Lease, pursuant to 11 U.S.C. § 365(d)(4).

There was nothing surprising about any of this: Sears' intention to assume the Mall of America Lease, and to assign it to a third party, was effectively made known to the landlord as soon as the APA was approved, which was back in February 2019. Any doubt about Sears' intentions with respect to the Mall of America Lease was resolved on April 19, 2019, when Holdco filed the Notice of Designation.

Many other parties also filed objections to other lease assignments proposed in the Notice; all such objections except MOAC's were resolved. That, no doubt, was because, while the Lease was a uniquely valuable asset of the bankruptcy estate, its many limitations on MOAC's rights as landlord – limitations for which it had freely bargained, albeit in a very different world – made it desirable for MOAC to recapture and end the lease if the Bankruptcy Code allowed it to do so.

7

MOAC did not want to see Sears' anchor tenant space subdivided or occupied by whoever would pay Transform the highest price. Rather, MOAC wanted another big box retailer to take over the space – even if it (like Sears) paid little or no rent – both to "preserve the character" of Mall of America and to ward off the possibility that MOAC might find itself in default on co-tenancy provisions in the leases of other Mall tenants if this giant space were not operated as a retail store.

Sears could neither assume the Lease nor assign it to Transform without obtaining Judge Drain's approval of that specific transaction. He held a hearing on MOAC's objections, all of which were directed to the inadequacy of Leaseco/Transform as the assignee of a shopping center lease, on August 23, 2019. At the end of that hearing, Judge Drain issued an extensive on-the-record oral ruling overruling all of MOAC's objections to the assignment of the Lease to Leaseco. In particular, he overruled the objection that Leasco had failed to give "adequate assurance of performance" because its financial condition was not "similar" to that of the debtor at the time the lease was executed back in 1991, as required by § 365(b)(3)(A).[5] Indeed, Judge Drain found that Transform had failed to prove that its financial condition was anything like that of Sears in 1991, as required by § 365(b)(3)(A). However, he concluded that other provisions in the Lease (which need not be discussed here) suggested that Transform could demonstrate adequate assurance of performance in a different way. And he held that this alternate, judge-made standard superseded the standard specified in the § 365(b)(3)(A).

On September 5, 2019, after consultation with the parties, Judge Drain entered an appealable order. (*See* Bankr. Dkt. No. 5074, APX1947 ("Transfer Order")). It provided, in

---

[5] Judge Drain concluded that the assignment to Transform did not violate § 365(b)(3)(D)'s requirement that the assignment not disrupt the tenant mix at Mall of America. This Court affirmed that holding in *Sears I. See* 613 B.R. at 74. That issue is not relevant to what is left of this case.

pertinent part, that Sears "was authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume and assign the [MOAC] Lease to the buyer [Transform] . . . ." (*Id.* at 12). The Order further provided that it "shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the 14 day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is expressly waived and shall not apply." (*Id.* at 19).

On September 6 – as soon as it had an appealable paper – MOAC filed (1) a notice of appeal in this court, and (2) a motion for a stay pending appeal in the Bankruptcy Court. Judge Drain denied the motion for a stay at a hearing held on September 18. He did so principally because Transform's counsel assured the learned Bankruptcy Judge that it would never rely on § 363(m) to argue that reversal or modification of his order on appeal did not affect the validity of the assignment to Leaseco in the absence of a stay. That section of the Code provides as follows:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Both Judge Drain and Transform were of the (mistaken) opinion that the assignment of the single Mall of America Lease did not constitute a "sale or lease of property" under this section, so § 363(m) did not apply. (*See* Stay Hr'g Tr., Bankr. Dkt. No. 5413 at 8:14-18, 9:23-25, 10:1). They believed this even though the APA specifically provided that a sale or conveyance of any individual lease would occur on the date when Holdco's designee took ownership by virtue of the "sale, transfer, assignment, conveyance and delivery" of the designated lease. (*See* APA §§ 2.6, 5.2(d)).

Lulled by Transform's representation to the Bankruptcy Court that it would never rely on § 363(m), MOAC did not seek a stay pending appeal in this Court. Had it done so, we might have been spared a great deal of trouble.

**MOAC's Appeal to this Court**

On February 27, 2020, this Court vacated Judge Drain's Transfer Order. *See Sears I*, 613 B.R. 51. As the Bankruptcy Court expressly found that Transform did not meet the very clear "substantial similarity" requirement of § 365(b)(3)(A) of the Code, I held that it had no authority to substitute a different standard for the one adopted by Congress for demonstrating adequate assurance of performance under a shopping center lease. After 44 months and a circuitous journey through the courts, that ruling was finally affirmed on the merits last November by the United States Court of Appeals for the Second Circuit. *MOAC Mall Holdings LLC v. Transform Holdco LLC* (*In re Sears Holding Corp.*), Nos. 20-1846-bk, 20-1953-bk, 2023 WL 7294833, at *1 (2d Cir. Nov. 6, 2023) ("*Sears V*").

The reason the Circuit's affirmance was so long in coming is that Transform – having (apparently unexpectedly) lost on the appeal from Judge Drain's order authorizing the assumption and assignment – went back on the representation that led Judge Drain to deny MOAC's motion for a stay pending appeal. Transform moved before me for rehearing, arguing that, per § 363(m), the sale of a lease to a good faith purchaser could not be undone if reversed on appeal unless the Bankruptcy Court's order had been stayed. Of course, it was thanks to Transform's representation that it would never rely on such an argument that there was no such stay. But Transform justified its *volte face* by noting that the Second Circuit, alone among Courts of Appeal, considered § 363(m) to be "jurisdictional" – that is, it had held that the section deprived an appellate court of jurisdiction to enforce any reversal/vacatur of a sale order in the absence of a stay. Transform

observed that jurisdictional arguments cannot be waived, which rendered its representation to Judge Drain of no force and effect.

That was indeed the law in the Second Circuit in 2020. So this court withdrew its February order vacating the assumption and assignment and remanded the case to the Bankruptcy Court for further proceedings. *MOAC Mall Holdings LLC v. Transform Holdco LLC (In re Sears Holding Corp.)*, 616 B.R. 615 (S.D.N.Y. 2020) ("*Sears II*"). As part of that decision, this Court concluded that the assignment of the Lease to Transform was, contrary to the belief of Transform and Judge Drain, a "sale" governed by § 363(m), both as a matter of law and under the terms of the APA. *Id.* at 629-34.

MOAC moved for rehearing in order to argue that Transform was a bad faith purchaser; I denied that motion. *MOAC Mall Holdings LLC v. Transform Holdco LLC (In re Sears Holding Corp.)*, No. 19-cv-09140 (CM), 2020 WL 3050554 (S.D.N.Y. June 5, 2020) ("*Sears III*").

**Appeal to the Second Circuit and the Supreme Court**

MOAC promptly appealed from this Court's order vacating the original decision. The Second Circuit summarily affirmed the vacatur. This was not surprising, since that court had long ago concluded that § 363(m) deprived this Court of jurisdiction to hear an appeal from an unstayed order – an order that it could not undo. *MOAC Mall Holdings LLC v. Transform Holdco LLC (In re Sears Holding Corp.)*, Nos. 20-1846-bk, 20-1953-bk, 2021 WL 5986997 (2d Cir. Dec. 17, 2021) ("*Sears IV*").

Transform "conditionally" cross appealed from this Court's original order, on the sole ground that Judge Drain was correct when he concluded that Transform had provided adequate assurance of performance of a shopping center lease. In light of its § 363(m) ruling, the Circuit

understandably ignored that cross appeal; it did not even bother to mention it when disposing of the case. *Id.* at *1.

MOAC then petitioned the Supreme Court for certiorari, which was granted. On April 19, 2023, that Court, in a unanimous opinion authored by Justice Jackson, concluded that the Second Circuit was wrong to deem § 363(m) to be "jurisdictional." It vacated *Sears IV* and remanded to the Circuit for further proceedings. *MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288 (2023) ("*MOAC*").

The Supreme Court held that "nothing in § 363(m)'s limits . . . purport[] to 'govern a court's adjudicatory capacity.'" *Id.* at 299 (quoting *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011)). It read § 363(m) "as merely cloaking certain good-faith purchasers or lessees with a targeted protection of their newly acquired property interest, applicable even when an appellate court properly exercises jurisdiction." *Id.* at 300. The Court also rejected Transform's argument that § 363(m) was jurisdictional because, once the res (here, the Lease) had left the bankruptcy estate, it had left the court's *in rem* jurisdiction. The Supreme Court found § 363(m)'s "relationship to traditional *in rem* jurisdiction" was "without more, not enough" to render the provision jurisdictional. *Id.* at 302. It noted that Transform's argument "sits uncomfortably with § 363(m)'s express contemplation that courts *can* touch – and affect the validity of – certain sales or leases . . . due to reversals or modifications of covered authorizations even though the property concerned has left the estate." *Id.* at 302-03. Moreover, "If a court, consistent with § 363(m), issues a judgment affecting a consummated sale's validity that draws on any *in rem* jurisdiction that Code

confers in § 1334, that conferral authorizes the exercise of *in rem* power with respect to a res that has left the estate." *Id.* at 303.[6]

Transform argued that former Federal Rule of Bankruptcy Procedure 805 – which was promulgated in 1976 and closely resembled the modern § 363(m) (enacted two years later, in 1978) – was "declaratory of a historic practice in which some appellate courts dismissed appeals challenging the validity of a consummated sale . . . without considering the merits." *Id.* at 303-04 (internal quotation omitted). Transform pointed out that Congress had transplanted Rule 805 into § 363(m), and urged that this meant § 363(m) assumed Rule 805's "jurisdictional character." *Id.* at 304. The Court found this insufficient to render § 363(m) jurisdictional, because "[e]very case [Transform] cite[d] to prove that Rule 805 was jurisdictional predates § 363(m)'s initial 1978 enactment, and thus long predates [the Supreme Court's] modern efforts on jurisdictional nomenclature." *Id.* (emphasis in original).

Transform raised yet another mootness argument in the Supreme Court. It urged – for the first time in any court – that MOAC's appeal was moot because the Code provides that unauthorized transfers are merely voidable, not void, and MOAC had not and could not maintain an avoidance action under § 549 of the Code. The Supreme Court noted that it "disfavor[s] these kinds of mootness arguments" and added that "MOAC simply seeks 'typical appellate relief: that the Court of Appeals reverse the District Court and that the District Court undo what it has done.'" *Id.* at 295-96 (quoting *Chafin v. Chafin*, 568 U.S. 165, 173 (2013)). The Court asserted that

---

[6] § 1334(e)(1) provides that in bankruptcy cases, district courts "shall have exclusive jurisdiction of all property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." 11 U.S.C. § 1334(e)(1). Further, the Supreme Court noted that "bankruptcy-court jurisdiction is not purely *in rem*." *MOAC*, 598 U.S. at 303 n.8 (citing *Central Va. Community College v. Katz*, 546 U.S. 356, 362 (2006) and *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995)).

"MOAC's arguments about legally available forms of relief are not 'so implausible that [they are] insufficient to preserve jurisdiction.'" *Id.* at 296 n.4 (quoting *Chafin*, 568 U.S. at 174). It "decline[d] to act as a court of 'first view,' plumbing the Code's complex depths in 'the first instance' to assure [itself] that Transform is correct about its contention that no relief remains legally available." *Id.* at 296 (quoting *Zivotofsky v. Clinton*, 566 U.S. 189, 201 (2012)).

**The Second Circuit's Mandate**

On remand, the Second Circuit directed that *Sears II* be vacated and agreed with MOAC that the time had come to address Transform's cross appeal from *Sears I*, because the "condition" that made that a "conditional" appeal had been met – Transform's jurisdictional argument under § 363(m) had been reversed, which meant the result in *Sears I* was effectively reinstated. The Court of Appeals then affirmed on the merits the order vacating the assumption and assignment that this Court announced in *Sears I*. *Sears V*, 2023 WL 7294833, at *1.

The Second Circuit refused to engage with Transform's argument that the case was moot or that the appeal should be dismissed because there was no remedy available to MOAC under the Bankruptcy Code. Those questions – some of which it concluded were merits-related rather than jurisdictional, *see id.* at *2 – it left for lower courts to grapple with. The Second Circuit's mandate commands this Court to consider whether MOAC's requested remedies – forfeiture of the Lease to it pursuant to § 365(d)(4), or, alternatively, monetary damages – are permitted by the Code and whether any arguments to the contrary are subject to the equitable doctrines of waiver, forfeiture, abandonment, or estoppel. *Id.*

**The Bankruptcy Plan & Global Settlement**

While all this was going on, the Sears bankruptcy was resolved and the Debtor emerged from chapter 11. On October 15, 2019, the Bankruptcy Court approved Sears' chapter 11 plan (the

"Plan"). (Bankr. Dkt. No. 5370). Sears operated as a debtor-in-possession ("DIP") until October 29, 2022, when the Plan became effective and the SRZ Liquidating Trust (the "Trust") came into existence. (Dist. Dkt. No. 64 at 3).

Consummation of the Plan was enabled by a global settlement that provided funding for Sears's creditors and releases of certain administrative and priority claims against the Debtor. (*Id.* at 3-4; *see* Bankr. Dkt. No. 10579 (the "Settlement")). The Settlement was approved by the Bankruptcy Court on September 2, 2022. (Bankr. Dkt. No. 10629).

The Settlement contains several terms that are relevant to this decision. The first provides that if Transform is unable to retain the Lease, the bankruptcy estate will not be required to refund any of the consideration that Transform paid to purchase, *inter alia*, the designation rights for the MOAC Lease:

> In the event . . . that as a result of a final, non-appealable order entered by a court of competent jurisdiction Transform is unable to obtain the assignment of the [MOAC] Lease . . . Transform acknowledges and agrees that it will not be entitled to an adjustment in (and the repayment by the Debtors of any of) the consideration Transform paid to the debtors under the APA (or the consideration it is paying to the Debtors under this Settlement Agreement).

(Settlement at 56). Instead, the Trustee agreed to

> execute any documents and to take any actions that Transform may reasonably request to effect the assignment of the Mall of America Lease to Transform or its designee and/or to allow Transform to obtain the economic benefits that the Debtors and Transform intended that Transform obtain from its acquisition of the Mall of America Lease.

(*Id.*)

The parties represent to the Court that this aspect of the Settlement resolved the many disputes that had arisen between Transform and Sears over the three years since *Sears I* was decided.

**The Parties' Arguments on Remand**

Transform and Sears separately ask the Court to dismiss this appeal as moot and end the case, on the ground that there is no remedy available to MOAC consistent with the Bankruptcy Code. Although unable to rely on § 363(m) to protect its title, Transform urges that ancient common law principles also protect the property rights of good-faith purchasers at judicial sales, meaning that parties aggrieved by such sales can look only to the proceeds of the sale – not to the property itself – for redress. Transform also argues that there is only one means under the Code of unwinding erroneous transfers – an avoidance action pursuant to § 549, which MOAC cannot bring, for two reasons: (1) the two-year statute of repose for avoidance actions under § 549 expired long ago; and (2) the right to bring an avoidance action belongs solely to Sears/the Trustee – not to MOAC – and Sears waived all avoidance claims in the Sale Order. (*See* Sale Order at 68 ("[T]he [APA] and the Sale Transaction shall not be avoidable under section 363(n) or chapter 5 of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the [APA] or the Sale Transaction.")). Finally, Transform claims that MOAC is estopped from challenging the Transfer Order because MOAC has benefitted financially from the assignment to Transform by accepting a cure payment, which was due only upon assumption of the Lease.

In the alternative, Transform and Sears argue that the Lease should return to the estate – which is to say, to the Sears Liquidating Trust – because Sears satisfied its obligations under § 365(d)(4) when it made and announced the admittedly timely decision to assume the Lease on April 19, 2019. That was the date on which the Lease was designated, and when, by operation of the court-approved APA, Sears became obligated to assume it. Additionally, both Transform and Sears argue that § 365(d)(4) of the Code does not apply to "leases" like the unusual lease at issue

in this case, relying on the Second Circuit's decision in *Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744 (2d Cir. 1991).

Sears (now in the person of the Liquidating Trustee) further argues that MOAC cannot collect damages from it, both because the chapter 11 plan contains a broad exculpation clause, and because MOAC has suffered no injury that money damages can compensate as a result of the erroneous transfer.

And if, for some reason, this Court were to find none of these arguments convincing, Transform and Sears ask the Court for what I will call the "counterfactual" solution. They ask asks that the parties be put back into the position they occupied on August 23, 2019, when Judge Drain erroneously announced his approval of the assumption and assignment to Transform. Transform argues that ruling that the § 365(d)(4) deadline has elapsed – thus effecting a forfeiture of the Lease to MOAC – would put MOAC in a better position than if the Bankruptcy Court had made the correct ruling on that date. They note that, if Judge Drain had denied the assignment, Sears would still have had eight days to file for standalone assumption of the Lease, rather than assumption and assignment.

MOAC counters that the case is not moot for lack of a remedy, because the Bankruptcy Code provides it with a perfectly adequate remedy: as the Lease was not properly assumed by Sears, and the Debtors' time for doing so has long since passed, the Trustee is required by the Code to tender the Lease to the landlord. 11 U.S.C. § 365(d)(4). Failing that, MOAC argues that it is entitled to damages – preferably from Transform, but if not, then from Sears – that will give it the equivalent of the economic value of the Lease. And it urges that certain arguments raised by Transform and Sears in opposition to this remedy – notably the arguments that the Lease is not really a "lease" subject to § 365(d)(4) and that MOAC cannot attack the Transfer Order because it

accepted benefits thereunder – have been waived or forfeited, or the parties are estopped from making them, because they were never raised before.

As for the proposed counterfactual, MOAC urges that the modified motion hypothesized by Transform and Sears could never have become reality, because Sears as it existed on August 23, 2019, was financially incapable of obtaining the necessary court approval of standalone assumption. MOAC also argues that Sears has waived, abandoned, and forfeited any arguments regarding standalone assumption, because (1) it never sought standalone assumption in the Bankruptcy Court; (2) Transform did not raise the issue of standalone assumption in its appeal to the Second Circuit; and (3) Sears did not take an appeal from *Sears I*, and neither Sears nor the Trust appeared in the Second Circuit or before the Supreme Court.


## DISCUSSION

I have often referred to this case as a "unicorn," and it truly is, in oh, so many ways. So the result is likely to be a unicorn as well – a response to a one-off situation that will likely never be repeated.

### I. TRANSFORM HAS FORFEITED ANY ARGUMENT THAT MOAC IS PRECLUDED FROM ATTACKING THE BANKRUPTCY COURT'S JUDGMENT

We start at the end, with Transform's argument that MOAC is precluded from attacking the Bankruptcy Court's judgment because it accepted the benefits of that judgment. Specifically, Transform made a "cure" payment to MOAC in the amount of $120,833.72, in order to remedy any defaults that occurred as a result of the assumption and assignment. This payment was required to be made within five days after entry of the Transfer Order on September 5, 2019 (Transfer Order at 13); no one contests that MOAC took the money. Nor is there any dispute that MOAC has

subsequently taken money from Transform to fund repair of the roof of the Sears store and to pay the common charges that are "additional rent" under the Lease.

In general, one who accepts the benefit of a judgment – even part of a judgment – waives its right to attack that judgment on appeal. *See In re Electric Power & Light Corp.*, 176 F.2d 687, 689-90 (2d Cir. 1949) (dismissing appeal of appellant who attacked a part of a plan of dissolution because the appellant had received the benefit of a different part of the plan, and the part appellant attacked was "an integral and non-separable part of the single plan under which she ha[d] voluntarily accepted benefits"); *Allen v. Bank of Angelica*, 34 F.2d 658, 659 (2d Cir. 1929) (dismissing appeal where the appellant accepted the full amount of the judgment below and argued on appeal that it should have been entitled to a larger sum).

But MOAC's acceptance of Transform's payment of common charges and taxes on the property, as well as the payment for the roof repairs, does not constitute "acceptance of the benefit *of a judgment*," because those payments were not made pursuant to a judgment. That money changed hands pursuant to a stipulation, dated March 9, 2020, that was expressly entered in order to preserve all parties' rights while the appeals were pending. (Dist. Dkt. No. 28 ¶ 3).

MOAC's acceptance of the cure payment is different. Transform made the payment in accordance with the Bankruptcy Court's Transfer Order, and MOAC took the money. This certainly suggests its tacit acceptance of the validity of that Order.

But Transform has plainly forfeited its right to make any argument that MOAC's acceptance of the cure payment precludes it from attacking the Bankruptcy Court's order. The cure payment was made within five days after entry of the Transfer Order. Transform could have argued as early as MOAC's original appeal to this Court that MOAC's acceptance of this payment vitiated its right to attack the validity of the very Transfer Order and so mooted its appeal. But Transform

never raised this potentially dispositive issue until the case was on remand to this Court after the Second Circuit reinstated the holding in *Sears I*. As a result, we have endured five years of litigation, all the way up to the United States Supreme Court – litigation that would never have taken place if Transform had timely raised this argument and prevailed thereon. I will not dismiss MOAC's appeal on the ground that MOAC has accepted the benefit of the order it is attacking. *See Roberts v. Bennaceur*, 658 F. App'x 611, 616 (2d Cir. 2016) (holding personal jurisdiction defense forfeited by engaging in motion practice and pretrial discovery); *Bascom v. Fried*, 116 F. App'x 300, 302 (2d Cir. 2004) (argument not raised in initial brief considered waived); *Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61-62 (2d Cir. 1999) (holding personal jurisdiction defense forfeited because, despite raising it in its answer, appellee had participated in pretrial proceedings without moving to dismiss despite several opportunities to do so).

## II.   THERE IS NO COMMON LAW BAR TO AN AWARD VACATING THE SALE OF THE LEASE TO TRANSFORM, BECAUSE THE COMMON LAW RULE ON WHICH TRANSFORM RELIES DOES NOT APPLY TO IT.

Ordinarily, deciding whether Transform could retain title to the Lease even though the assignment was approved in error would be easy. Judge Drain authorized the sale of the Mall of America Lease to Transform, and his incorrect decision was not stayed pending appeal. So the sale cannot be undone – even though his order authorizing the assumption and assignment has been vacated – because § 363(m) of the Code protects a good faith purchaser in Transform's position, and this Court has found Transform to be a good faith purchaser within the meaning of § 363(m). *See Sears III*, 2020 WL 3050554, at *4.

But – and this is why this case is a unicorn – Transform has waived reliance on the protection that § 363(m) gives to a good faith purchaser. It did so in order to avoid entry of a stay pending appeal, which – had one been ordered – would have preserved the possibility that its title to the Lease could be revoked. Therefore, the fact that there was no stay pending appeal does not

insulate Leaseco's title, or prevent MOAC from arguing that it should be divested of that title now that the Transfer Order has been overturned.

So clear was its waiver that Transform does not now rely on § 363(m). Instead, it points to the ancient common law rule that safeguards title that vests in a good faith purchaser at a judicial sale. It argues that this rule means it gets to keep the property (the Lease), while MOAC can look only to the proceeds of the sale for a remedy. Transform notes that this rule has been in effect at common law for centuries. *See, e.g., Gray v. Brignardello*, 1 Wall. 627, 634 (1863); *Vorhees v. Jackson*, 35 U.S. 449, 475-76 (1836).

But it has also been the law for centuries that the common law rule on which Transform relies does not apply to Transform, or to any party in its position. It applies only to good faith purchasers *who were not parties to the proceeding in which the sale order was entered*. Where the purchaser at a judicial sale was a party to the judicial proceedings leading up to the sale – as Transform was here – it is charged with notice of any defects in the proceedings, and its title will be defeated if the order authorizing the sale is reversed on any ground. *Citibank NA v. Data Lease Fin. Corp.*, 645. F. 2d 333, 336-37 (5th Cir 1981); *see also Hays v. Sound Timber Co.*, 261 F. 571 (9th Cir. 1919).

"[T]he rule that the title of the purchaser will be protected has been held not to apply where the purchaser was a party to the suit in which the sale was ordered." 50A C.J.S. *Judicial Sales* § 90 (2024) (collecting cases from Alabama, Kentucky, and Washington state). "Although there is authority to the contrary, the rule protecting bona fide purchasers in case of reversal usually does not apply, where the purchaser is a party or a privy to the suit in which the sale was ordered, and the title of such purchaser will be defeated by a subsequent reversal of the judgment or decree upon which the sale was made." 47 AM. JUR. 2D *Judicial Sales* § 22 (2024) (footnotes omitted)

(citing *Lytle v. Payette-Oregon Slope Irr. Dist.*, 152 P.2d 934 (Or. 1944)). "In the majority of jurisdictions where the question has been judicially determined, the rule has been laid down that if the judgment creditor, or any other party to the record, purchases at the execution sale, a reversal or vacation of the judgment puts an end to his title." 29 A.L.R. 1071 (originally published in 1924). This treatise collects cases from eighteen states that have adopted this exception to the common law rule; they include New York, where this rule has been in effect for almost two centuries. *Id.*; *see, e.g., Dater v. Troy Tpk. & R.R. Co.*, 2 Hill 629 (N.Y. Sup. Ct. 1842).

Pennsylvania does not follow this general rule, but for a very specific reason.[7] "In Pennsylvania . . . it has been held *under a statute protecting purchasers from a subsequent reversal*, that, though the judgment creditor or any other party to the record is the purchaser at the execution sale, his title will be unaffected by a subsequent reversal of the judgment." 29 A.L.R. 1071 (emphasis added) (collecting cases from the 1800s). In other words – and this is of great significance – Pennsylvania's Legislature did exactly what Congress did when it incorporated § 363(m) into the Bankruptcy Code. It passed a law that overrode the common law rule and specifically guaranteed a good faith purchaser's title – even when that purchaser was a party to the underlying litigation that led to the judicial sale.

The Court has not located any decision addressing this issue from the courts of Minnesota, where Mall of America is located. But there is no reason to believe that it would not follow the common law rule, which has been judicially sanctioned in the neighboring state of Wisconsin, as well as California, Delaware, Florida, Illinois, Indiana, Iowa, Kansas, Kentucky, Massachusetts,

---

[7] In North Carolina, the North Carolina Supreme Court, in a decision that is over 200 years old, said: "We are therefore of opinion, that the plaintiff in error is not entitled to restitution even against the plaintiff in the original judgment, where the sale has taken place under a *fieri facias* and without fraud." *Bickerstaff v. Dellinger* (1809) 5 N.C. (1 Mur.) 272, 275 (1809). It is not clear from this decision whether the "plaintiff in error" was a party to the original lawsuit.

Missouri, Nebraska, New Hampshire, New York, Ohio, Tennessee, Texas and Washington. And no

party has cited me to any Minnesota statute that, like Pennsylvania's and the Bankruptcy Code's,

overrides the common law rule.

The Restatement (Third) of Restitution and Unjust Enrichment says that, "The traditional

protection of purchasers at judicial sales . . . extends only to purchasers who are strangers to the

record. *Such a rule leaves unprotected . . . [a] creditor who buys property of the debtor from the

bankruptcy trustee.*" RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 18, note

f (AM. LAW INST. 2011) (emphasis added). That is because creditors are parties to the underlying

bankruptcy litigation. The only protection for such a purchaser is found in § 363(m).

Transform may not exactly be a Sears creditor, but its position is no different than that of

any other party that appeared in the bankruptcy action. As a result, the common law rule does not

protect it. And § 363(m) – which is, after all, simply a codification of the ancient common law rule

– is unavailable to Transform as a defense to reversal of the sale in this case.

As a result of the foregoing, Transform's argument that a sale in bankruptcy can only be

undone via an avoidance action falls out of the case – not because MOAC lacks standing to bring

such an action (a point on which MOAC agrees), and not because Sears waived avoidance actions

in the Sale Order, but because, in the absence of the protection afforded by § 363(m), Transform

cannot avoid the consequences of vacatur of the order that assigned the Lease to it. Transform no

longer has title to the Lease. That is law of the case. There is no transaction for the Debtor to avoid;

this Court and the Second Circuit have already undone the deal and left Transform with nothing

that could be the subject of an avoidance action.

Because the assignment to Transform has been vacated, MOAC can look to the property,

rather than the proceeds of the sale, for a remedy – as the Supreme Court itself recognized, when

it said in *MOAC* that "§ 363(m)[] express[ly] contemplat[es] that courts *can* touch – and affect the validity of – certain sales or leases (*e.g.*, those made to bad-faith purchasers) due to reversals or modifications of covered authorizations even though the property concerned has left the estate." 598 U.S. at 302-03. This is nothing more than an ordinary appellate remedy – the appellate court has affirmed what the district court did, which was to overturn the bankruptcy court's error.

So consider Transform divested of its title. It no longer owns the Mall of America Lease. Vacatur of the order authorizing the assignment took care of that.

But that does not get the Lease back to MOAC. It only gets the Lease back to the Debtor – the party from which it was purchased. It puts the Lease in the hands of the Liquidating Trustee, from which MOAC seeks to wrest it.

## III.  THE TRUSTEE, NOT MOAC, GETS TO KEEP THE LEASE

### A.  The Relevant Law

Assumption of a lease by a tenant in bankruptcy, no less than any other action by a debtor or its trustee, must be approved by the court. 11 U.S.C. § 365(a) ("A trustee, ***subject to the court's approval***, may assume or reject any executory contract or unexpired lease term of the debtor.") (emphasis added). "Since 11 U.S.C. § 1107(a) gives debtors-in-possession the same rights and powers of a trustee, a debtor-in-possession . . . also may assume a contract ***with bankruptcy court approval***." *Orion Pictures Corp. v. Showtime Networks* (*In re Orion Pictures Corp.*), 4 F.3d 1095, 1098 (2d Cir. 1993) (emphasis added). Courts will approve a debtor's motion to assume "upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment." *In re MF Glob. Holdings Ltd.*, 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012) (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984)). "Courts generally will not second-guess a debtor's business judgment concerning whether the assumption or rejection

of an executory contract or unexpired lease would benefit the debtor's estate." *Id.* (citing *In re Balco Equities Ltd., Inc.*, 323 B.R. 85, 98 (Bankr. S.D.N.Y. 2005).

However, assumption by the debtor is subject to the same financial constraints as assignment to anyone else. Existing defaults must first be cured or assurance of prompt cure must be provided before a debtor may assume a lease. *See* 11 U.S.C. § 365(b)(1)(A). The Bankruptcy Code also requires a debtor to compensate the landlord, or provide adequate assurance that it will promptly compensate the landlord, for any actual pecuniary loss stemming from such default. *Id.*

A debtor is also required to provide adequate assurance of future performance under the contract or lease to be assumed if there has been a default under the agreement. *Id.* § 365(b)(1)(C). And of course, because the Lease is one for "real property in a shopping center," § 365(b)(3) sets the standard for "adequate assurance of performance," which means, *inter alia*, providing information about how the rent and other consideration under the Lease will be paid. Importantly, the debtor does not have to satisfy the standard that tripped up Transform/Leaseco as the proposed assignee in this case: only a proposed assignee of a lease, not an assuming debtor, must prove that its financial condition and operating performance are similar to that of the debtor at the time the Lease was signed. That should not be surprising; no debtor in bankruptcy would ever be able to assume a lease if it were required to make such a demonstration.

Finally, under Bankruptcy Rule 9014(a), a landlord may oppose a debtor's motion to assume. *See, e.g., In re M. Fine Lumber Co., Inc.*, 383 B.R. 565, 568 (Bankr. E.D.N.Y. 2008); *Buchakian v. Musikahn Corp.*, 69 B.R. 55, 56 (E.D.N.Y. 1986).

The Code sets a strict time limit for a debtor to indicate its intention to assume a nonresidential lease. Section 365(d)(4) of the Bankruptcy Code provides as follows:

> (A) Subject to subparagraph (B), an unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected, and the trustee

shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of—

    (i)    the date that is 120 days after the date of the order for relief; or

    (ii)    the date of the entry of an order confirming a plan.

(B)

    (i)    The court may extend the period determined under subparagraph (A), prior to the expiration of the 120-day period, for 90 days on the motion of the trustee or lessor for cause.

    (ii)    If the court grants an extension under clause (i), the court may grant a subsequent extension only upon prior written consent of the lessor in each instance.

11 U.S.C. § 365(d)(4).

This section gives a debtor's trustee (or a DIP) who is a tenant under a commercial lease a fixed period within which to decide whether to assume or reject an unexpired commercial lease. If the debtor/tenant fails to assume the lease within the statutory period, it is deemed rejected and the trustee or DIP "shall" surrender the property back to the landlord.

Section 365(d)(4) evinces a Congressional concern for "limiting the discretion of judges to extend time to assume or reject certain commercial contracts and . . . providing landlords with greater certainty as to such tenancies." *In re Eastman Kodak Co.*, 495 B.R. 618, 622 (Bankr. S.D.N.Y. 2013); *see also Cousins Props, Inc. v. Treasure Isles HC, Inc. (In re Treasure Isles HC)*, 462 B.R. 645, 650 (B.A.P. 6th Cir. 2011) ("Congress was concerned with balancing the interests of debtor lessees in having enough time to make 'informed' decisions about leases against the interests of lessors in not being left in doubt concerning their status vis-à-vis the estate."); *Alegre v. Michael H. Clement Corp. (In re Michael H. Clement Corp.)*, 446 B.R. 394, 402 (N.D. Cal.

2011) ("The purpose of § 365(d)(4) . . . is to protect lessors from delay and uncertainty by forcing the trustee or debtor-in-possession to act quickly to assume unexpired leases.").

Section 365(d)(4) sets a hard and fast deadline for assumption; if the deadline is not met, the Code provides that the Lease "shall immediately" be surrendered to the Landlord. "Shall" is not a word that admits of any wiggle room. As the *Eastman Kodak* court noted, the whole idea was to limit judicial discretion to extend the time within which a trustee or DIP can assume a lease. 495 B.R. at 622. This Court has no intention of reading § 365(d)(4) out of the Code by concluding, as Transform urges, that it would be "bad policy" to view this section as setting an absolute deadline beyond which a DIP or trustee cannot assume a non-residential lease. As far as I am concerned, Congress set the policy when it passed the provision. It may be bad policy (though this highly unusual case is the last case that ought to dictate generally applicable policy), but if it is, Congress must correct its error. The terms of the Code are clear. I have already held once in this lawsuit that a court has no business second-guessing decisions explicitly made by Congress or overriding them with solutions that contravene the express language in the Code. That ruling was affirmed. I see no reason to adopt a different stance simply because Transform and Sears now find themselves in an uncomfortable position.

However, that does not answer the question before me, which is whether MOAC gets the Lease back by application of § 365(d)(4). I turn to that issue.

B.  Sears Assumed the Lease for Purposes of § 365(d)(4) in April 2019 But That
    Assumption Was Properly Vacated by This Court

The purpose of § 365(d)(4) is to provide the landlord with certainty about the fate of its property – not to provide it with a windfall. So once the landlord knows what the debtor-tenant intends to do with the lease, it has received all the protection to which the Code entitles it. And it is "well established that for purposes of section 365(d)(4), the trustee assumes the lease of

nonresidential real property 'when he makes up his mind to do so and communicates his decision in an appropriate manner, such as by filing a motion to assume.'" *In re Fosko Mkts, Inc.*, 74 B.R. 384, 387-88 (Bankr. S.D.N.Y. 1987) (quoting *By-Rite Distrib., Inc. v. Brierley* (*In re By-Rite Distrib., Inc.*), 55 B.R. 740, 753 (D. Utah 1985) and collecting cases).

Filing a motion to assume a lease is sufficient to satisfy the § 365(d)(4) deadline. *See, e.g.*, *In re Scorpion Fitness Inc.*, No. 19-11231 (MEW), 2020 WL 2529357, at *3 (Bankr. S.D.N.Y. May 18, 2020); *In re Flying Star Cafes, Inc.*, No. 15-10182 (DTT), 2016 WL 8115494, at *4 (Bankr. D.N.M. Dec. 23, 2016); *In re Simbaki, Ltd.*, 520 B.R. 241, 243-45 (Bankr. S.D. Tex. 2014); *In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2014 WL 1713416, at *9 (Bankr. D. Del. Apr. 29, 2014); *Treasure Isles*, 462 B.R. at 649; *In re Amerlink, Ltd.*, No. 09-01055-8-RDD, 2009 WL 2497776, at *2-4 (Bankr. E.D.N.C. Aug. 12, 2009). As long as the debtor files a timely motion, it does not matter if the bankruptcy court rules on the motion after the § 365(d)(4) deadline has passed; otherwise, "[t]he period within which the trustee could consider assumption or rejection would vary widely, depending on the vagaries of a particular bankruptcy court's caseload and local procedures." *Treasure Isles*, 462 B.R. at 650; *see also In re Filene's Basement, LLC*, 2014 WL 1713416, at *9 ("[W]hen Congress intends to set a time by which the court must act, it says so explicitly"); *In re Amerlink, Ltd.*, 2009 WL 2497776, at *2-4 (noting that "[h]ad Congress intended that assumption of the lease required the entry of an order within 120 days of the date of the entry of the order for relief, Congress could have simply included language" requiring so).

Pursuant to the procedure Judge Drain devised for designating leases for assumption and assignment as authorized by the APA, Sears was to file a "notice" (rather than yet another motion) whenever Transform identified a Designatable Lease or Leases over which it wished to take ownership. In relation to the Mall of America Lease, such a notice was filed (albeit by Holdco –

which is to say, by Transform – rather than by Sears itself) on April 19, 2019. MOAC filed a timely objection to the assignment of the Lease to Holdco's designated assignee (Leaseco), principally on the ground that Leaseco failed to meet two of the four special requirements for assignees of shopping center leases, which are specified in 11 U.S.C. § 365(b)(3)(A) and (D). MOAC did not, however, object to the notice on the ground that it was filed by the wrong party – by Holdco, not by Sears – so it has waived any such objection.

It seems that, as a matter of law, Sears satisfied the § 365(d)(4) deadline on April 19, 2019. The law on this point seems clear.

But while Sears may have "assumed" the Lease for purposes of § 365(d)(4) when Holdco filed the notice of designation, that "assumption" was always subject to defeasance. Sears could not actually assume the Lease without Bankruptcy Court approval. The Bankruptcy Court approved Sears' assumption of the Lease only in order to effectuate the assignment. That is all it was ever asked to do; Sears did not move in the alternative for standalone assumption. The record (at least that portion of the record in the Bankruptcy Court with which this Court is familiar) does not contain any evidence that would have allowed Judge Drain to let Sears assume the Lease on a standalone basis. All the cure and financial condition evidence in the record relate to the Transform, the proposed assignee pursuant to the APA; all arguments were directed to Transform's ability to satisfy § 365(b)(3); and all the findings in this regard were about Transform.

That is not to say Sears *could not* have met those requirements, but I am in no position to figure that out. I know only what the parties have told me about Sears' financial condition. I do not have before me any evidence that would allow me to decide whether – in order not to forfeit so valuable an estate asset – Sears could have convinced Judge Drain, back in August 2019, that it was capable of paying the annual rent (which, we must recall, had been prepaid to that point and

beyond) and the rather greater amount of additional rent in the form of taxes, insurance and common charges (which amounted to about $1 million to $1.2 million per year).

It is, however, indisputable that Sears had made no such showing in connection with its effort to obtain approval of Lease assumption. The text of the Transfer Order makes that perfectly clear. It says, in pertinent part, "All of the requirements of sections 365(b) and 365(f), including without limitation, the demonstration of adequate assurance of future performance and payment of Cure Costs required under the Bankruptcy Code have been satisfied *for the assumption by the Debtors*, and the assignment by the Debtors to the Buyer [Transform] . . . with respect to the Designated Lease." (Transfer Order at 15 (emphasis added)). The requirements of sections 365(b) and (f) that were a precondition to *assumption by the Debtor* were satisfied only by showing Judge Drain that *Transform* could pay Cure Costs and (or so the Bankruptcy Judge thought) that *Transform* had adequately assured performance – not that *Sears itself* could. Once the assignment was deemed illegal, the assumption authorized by the Transfer Order necessarily fell, because Sears had not made any showing to Judge Drain that it could have met the § 365(b) requirements for a debtor's assumption of the Lease on a standalone basis, and Judge Drain had authorized no such assumption.

So this Court was correct to grant MOAC's request to vacate the assumption as well as the assignment. As far as I know, that means Sears' satisfaction of the § 365(d)(4) deadline ceased to have any legal relevance – although the Court has not found any case discussing what happens to § 365(d)(4) if a timely motion to assume a lease is denied.

The question, then, becomes whether it is either (1) necessary, or (2) possible for Sears to have an opportunity, at this late date – long after the passage of either deadline in § 365(d)(4), let alone the earlier of those deadlines – to convince the Bankruptcy Court that it had the wherewithal

in August of 2019 to do what any sane person would concede was the best thing *for the estate* – prevent the loss of this uniquely valuable asset by assuming it, at least temporarily, on a standalone basis.

C.  The Second Circuit's Decision in *RPI* Means the Mall of America Lease is Not Subject to § 365(d)(4), and This Argument Has Not Been Waived

MOAC argues that it is neither necessary nor possible for Sears to have the opportunity to obtain standalone assumption for a simple reason: when this Court vacated the assumption, the date by which assumption had to occur pursuant to § 365(d)(4) – a date the parties had stipulated to be August 31, 2019 – was but a distant memory. As far as MOAC is concerned, vacatur of the assumption means that, as of the date the Court of Appeals affirmed the decision in *Sears I*, the Lease had to be deemed rejected, and the Trustee was obliged to surrender it to the landlord, as Sears had not made, and could no longer make, a timely motion to assume the Lease. That result, it insists, is dictated by the unforgiving terms of the Code.

The terms of the Code are indeed clear and unforgiving. However, relying on the Second Circuit's decision in *Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744 (2d Cir. 1991) ("*RPI*"), Sears[8] now argues that the MOAC Lease is not subject to § 365(d)(4), because it is not a "true lease," in economic terms, but more like ownership of the property.

In *RPI*, Kubar, the debtor, acquired the rights, title and interest to a lease agreement to which RPI was the lessor. *RPI*, 936 F.2d at 746. The lease in *RPI* was unusually favorable to the tenant in many ways that are identical to the Sears lease at Mall of America. It ran for a term of 99 years and called for a total base rent of $97,830, or just under $1,000 per year, all of which was pre-paid within the first three years of the lease. It provided that the tenant would pay, as

---

[8] Transform principally makes this argument, but Transform is out of the case now, as it no longer owns the Lease. This is now a matter between the MOAC and the Liquidating Trustee.

"additional rent," certain expenses associated with running the property – taxes, assessments, utilities. *Id.* As Sears did, the debtor in RPI built the demised premises. *Id.* Home & City Savings Bank (the "Bank") lent the debtor $3 million to finance the construction of a manufacturing facility on the leased property, $2 million of which was secured by the debtor's leasehold interest. *Id.*

Three years after the debtor had filed for reorganization under Chapter 11, the trustee in bankruptcy petitioned the bankruptcy court for an extension of time to assume or reject the ground lease under § 365(d)(4). Its motion was denied.

The Bank appealed the order rejecting the trustee's motion for an extension of the § 365(d)(4) period. *Id.* On appeal, RPI argued, as MOAC does here, that because the trustee did not move to assume or reject the lease within the statutory time limit, the lease had terminated as a matter of law. The Bank countered that the lease in suit was not subject to the § 365(d)(4) deadline, because when one examined the economic realities of the underlying transaction, the lease was not a "true lease." *Id.* at 748.

The Second Circuit agreed with the Bank. It concluded that the RPI lease was not a "true lease" because the parties had imposed obligations and conferred right "significantly different from those arising from the ordinary landlord/tenant relationship." *Id.* (quoting *Liona Corp. v. PCH Assocs. (In re PCH Assocs.)*, 804 F.2d 193, 200 (2d Cir. 1986)). That being so, "a court must look to 'the economic substance of the transaction and not its form.'" *Id.* (quoting *PCH Assocs.*, 804 F.2d at 200).

The *RPI* court focused on the 99-year term, combined with the fact that the landlord "had already received all the direct financial payments it was due under the entire lease by the time of the bankruptcy." *Id.* at 750. Moreover, the court considered Congress's intent when passing § 365(d)(4) and concluded that the phrase "lease of nonresidential real property" as used therein

did not include transactions where "the 'lessors' are essentially sellers or lenders." *Id.* (quoting S. REP. NO. 95-989, at 64 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5850). While the court cautioned that not every "triple net" lease (i.e., a lease under which the tenant makes direct payment of things like taxes and operating expenses) would qualify as effective ownership of property for purposes of getting out from under § 365(d)(4), it concluded that the lease in *RPI* was not like an ordinary triple net lease, principally because it was "essentially pre-paid in nature." *Id.* at 751.

Finally, the appellate court also noted that it would have been "grossly inequitable" to allow RPI to recapture the leased premises, observing that, "[t]he tenant ha[d] pre-paid the lease and constructed a manufacturing facility on the leased premises [and] RPI ha[d] received the substance of its bargained for consideration." *Id.*

Significantly for our purposes, the Court of Appeals did not indicate that the "true lease" or "economic substance" argument would render any section of the Code other than § 365(d)(4) inapplicable. It did not rule, for example, that because of the economic substance of the transaction in the RPI lease, all of § 365 – including § 365(b)(3), the section of the Code at issue in *Sears I-IV* – was inapplicable to RPI's situation. The only issue raised in the *RPI* case was whether the debtor had forfeited the lease because it failed to make a timely motion pursuant to § 365(d)(4). The Second Circuit held nothing more than the "agreement should not be treated as a lease *for the purposes of § 365(d)(4)*." *Id.* at 750 (emphasis added).

The Lease here closely resembles the lease at issue in *RPI*; there are a few differences but they are inconsequential. Therefore, the Second Circuit's holding in *RPI* should mean that the MOAC Lease is also not a "true lease" and so is not subject to the strictures of § 365(d)(4).[9]

Certainly, the Second Circuit's observation about the gross inequity of allowing the landlord to recapture the premises in *RPI* is equally applicable here. In both cases, "The tenant ha[d] pre-paid the lease and constructed a . . . facility on the leased premises[ and the landlord] has received the substance of its bargained for consideration." *Id.* at 751. In this case Sears both constructed the store at its own expense and pre-paid the first thirty years (through 2021) of the $10 annual "rent";[10] by the time any more "rent" came due, Sears had been in chapter 11 for three years. Chapter 11 of the Bankruptcy Code provides generous protections to commercial landlords, especially shopping center landlords. But the purpose of chapter 11 is to preserve and maximize the value of the debtor's estate for the benefit of all creditors – not to provide windfalls to any, or to allow landlords to improve the position they occupied as a result of a bad bargain prior to bankruptcy. *See Gunsalus v. County of Ontario*, 37 F.4th 859, 866 (2d Cir. 2022); *Androse Assocs. of Allaire, LLC v. Great Atl. & Pac. Tea Co. (In re Great Atl. & Pac. Tea Co.)*, 472 B.R. 666, 675 (S.D.N.Y. 2012).

It is inarguable that MOAC has received all the benefits, financial and otherwise, to which it as Sears' landlord is entitled under the Code, consistent with the goals of chapter 11. The store that Sears constructed, which was the essential and most significant aspect of the MOAC's

---

[9] I note that Sears' ongoing obligation to pay certain costs associated with running the property (taxes, insurance, utilities) are not, strictly speaking, "compensation to the landlord," but represent either the direct payment or dollar for dollar reimbursement of expenses that a landlord under an ordinary lease would be required to pay to third parties (the government, the insurance company, the electric company).

[10] "Tenant is paying to Landlord the sum of Three Hundred Dollars ($300.00) in payment of Rent for the first thirty (30) Lease Years of the Term hereof." (Lease ¶ 21.1)

"bargained for consideration" under the Lease, is still sitting in the Mall, and all the rent due thereunder prior to the chapter 11 filing was pre-paid. Vacatur of the assignment to Transform on the ground that the latter failed to comply with § 365(b)(3)(A) means that MOAC has been protected from assignment to a disqualified entity. That protection, not forfeiture of the Lease, is the special protection to which a shopping center landlord is entitled under § 365(b)(3) of the Code. All defaults under the Lease have been cured and all operating costs incurred *pendente lite* have been covered (by Transform), as agreed by the parties in order to preserve their rights throughout this lengthy appellate process. Reversion of the Lease to Sears (in the person of the Liquidating Trustee) today, after Sears has emerged from bankruptcy, does mean that Sears can assign the Lease to pretty much whomever it wishes (aside from Transform[11]); but that is because the bankruptcy is over, so the rule of § 365(b)(3) that disqualified Transform is no longer applicable.

All this means is that the Trustee's forfeiture of the Lease to MOAC would be no more equitable in this case that it was in *RPI*.

Additionally, § 365(d)(4) was passed to protect landlords by ensuring that they are not left endlessly in the dark about whether their leases will be assumed or rejected. *See Eastman Kodak*, 495 B.R. at 622; *Treasure Isles*, 462 B.R. at 650; *Michael H. Clement Corp.*, 446 B.R. at 402. MOAC was never in the dark about Sears' intentions with respect to the Mall of America Lease, nor could it have been. That Lease – itself a unicorn – was a uniquely valuable estate asset; only a moron would have thought that Sears was not going find some way to monetize it, and MOAC and its counsel are anything but.

---

[11] The parties have advised the court that there will be no such assignment, and the Settlement Agreement between Transform and the Trustee – which assures that Transform will not suffer economically as a result of the Court's vacatur of the assignment – explains why.

Of course MOAC would like to get out from under the Lease, which has turned out to be a terrible deal for the landlord. But the Lease contains the bargain MOAC knowingly struck in exchange for having a large edifice built in its mall at no cost to itself. Even the fact that the store has remained unoccupied since Sears ceased operation at Mall of America does not work any economic harm to MOAC, because the Lease gave Sears the right to go dark at any time after 2007, with no obligation either to resume operations or sublease the space. Bankruptcy is not supposed to be a vehicle for placing a landlord in a better position than it occupied prior to the debtor's filing. *Great Atl. & Pac. Tea Co.*, 472 B.R. at 675. Keeping the MOAC Lease with Sears keeps MOAC in the position it occupied prior to bankruptcy; forfeiting it to MOAC places the landlord in a far better position than it occupied in 2018.

Nonetheless, MOAC says, "too bad, so sad." It argues that Sears cannot make the *RPI* argument, for two reasons:

1. *RPI* is inapplicable because in this case the parties stipulated (i) that the Lease was in fact a "lease," and (ii) to extend the § 365(d)(4) deadline – an implicit acknowledgement that the section applied to the Mall of America Lease.

2. Sears (and Transform) forfeited this argument by failing to make it long ago, and are estopped from relying on it now.

I find neither of MOAC's arguments convincing.

We start with the stipulations.

On May 13, 2019, and again on June 23 and July 31, 2019, MOAC, Sears and Transform stipulated that the § 365(d)(4) deadline was extended – ultimately to August 31, 2019. The stipulations were legended: "Stipulation and Order by and Among Sellers, Buyer, and MOAC Mall Holdings LLC Extending Time Under 11 U.S.C. § 365(d)(4) for Lease of Nonresidential Real

Property."[12] In two of those stipulations, the parties stipulated that Mall of America was a shopping center. (*See* Bankr. ECF No. 4354, APX 4176 ¶ 4; Bankr. ECF No. 4687, APX 4186 ¶ 4). And in another stipulation, signed on or around August 16, 2019, MOAC, Sears and Transform expanded that stipulation to say: "Mall of America is a shopping center *and the Lease is a shopping center lease pursuant to 11 U.S.C. § 365(b)(3).*" (Aug. 16, 2019 Stip. ¶ 6) (emphasis added). MOAC argues that these stipulations constitute admissions that the Lease in this case is "true lease" and so is subject to § 365(d)(4), notwithstanding *RPI* (which decision is not mentioned in the stipulations).

But the stipulations mean no such thing. Critically, the parties did not stipulate that the Lease was a "lease" that was subject to § 365(d)(4) – they stipulated only that it was a "shopping center lease" for purposes of § 365(b)(3). As noted above, the Second Circuit carefully limited its "true lease" ruling to the deadline in § 365(d)(4); it said that the RPI lease was not a true lease for purposes of that section alone. Had the Court of Appeals meant to exempt a lease like the MOAC Lease from the ambit of § 365 altogether – from, for example, requiring that an assignee of the lease offer the landlord adequate assurance of performance[13] – it could and undoubtedly would have said so. The reasoning of *RPI* applies exclusively to the one provision in the Code that works a forfeiture to the detriment of the debtor and its creditors if the debtor fails to assume the lease within a specified time period. Nothing in the opinion precludes an agreement's being a "shopping center lease" for purposes of § 365(b)(3) but not being a "true lease" for purposes of § 365(d)(4).

---

[12] It is a well settled principle of contract law that the titles and headings in documents are rarely considered to be part of the parties' agreement unless the agreement expressly so provides. *See Heryford v. Davis*, 102 U.S. 235, 243-44 (1880) ("What, then, is the true construction of the contract? The answer to this question is not to be found in any name which the parties may have given to the instrument . . . but in the ruling intention of the parties, gathered from all the language they have used . . . The form of the instrument is of little account.")

[13] Because the MOAC Lease was a shopping center lease the adequate assurances of performance were heightened, but § 365 imposes adequate assurance of performance requirements on any assumption or assignment.

It is of course true that the repeated stipulations extending time would not have been necessary if it were clear that the MOAC Lease was not subject to § 365(d)(4) as a result of *RPI*. However, that is not a question that answers itself; it is a question that can only be answered by a judge. I can, and I do, view the stipulations extending time as the kind of belt-and-suspenders thing that lawyers often do in order to preserve their rights. Transform and Sears gained no benefit or advantage by stipulating to the extension; postponing a deadline that had arguably already been satisfied simply meant postponing having to consider whether there was any such deadline. Given the pace at which things were moving in the Bankruptcy Court, entering the stipulations was the safest course to pursue in the moment. I cannot read into them any concession that the MOAC Lease does not fall within the rule of *RPI*.

But because only a judge could answer the ultimate question – is the MOAC Lease exempt from § 365(d)(4) under *RPI* – one must ask whether Sears (or Transform, which acted in lieu of the Debtor) was obliged to raise this issue at an earlier point in this lawsuit.

I do not believe so. Indeed, I cannot see that a court would or could have considered it before today.

Judge Drain did not need to decide whether the Sears Lease at Mall of America was an *RPI* lease in order to decide the Transform/Sears motion to assume and assign. He had to decide whether Transform was an adequate assignee and whether the various requirements of § 365(b) and (f) had been met. That issue had nothing to do with the applicability of § 365(d)(4) to the MOAC Lease. I cannot think of a single reason why Transform and Sears would have been required to anticipate that a ruling in their favor (which had not yet been handed down) might someday be vacated, thereby giving rise to the possibility that MOAC would pounce on

§ 365(d)(4) to support forfeiture of the Lease.[14] Courts do not deal in hypotheticals; judges are not supposed to give advisory opinions about what might happen if their decisions are ultimately reversed. So Transform and Sears did not waive or forfeit the *RPI* argument by failing to make it in the Bankruptcy Court back in the summer of 2019.

Nor were they obligated to raise the issue in any subsequent appeal.

When the case first came before me, Judge Drain had approved the assumption and assignment, and MOAC did not contend that he should have disallowed the transaction because Sears had failed to comply with § 365(d)(4). So there was no reason for this court to address § 365(d)(4) when deciding Sears *I* (or *II* or *III*). As the appellee on MOAC's appeal, Transform was obligated only to respond to the arguments made by MOAC about why Judge Drain's ruling was wrong – not to invent arguments about the consequences of a hypothetical reversal. *Brown v. City of New York*, 862 F.3d 182, 188 (2d Cir. 2017); *Car Freshner Corp. v. Am. Covers, LLC*, No. 5:17-cv-171, 2021 WL 4502281 (TJM), at *4 (N.D.N.Y. Sept. 30, 2021).

Although this Court vacated Judge Drain's order approving the transaction in *Sears I*, that was quickly followed by *Sears II*, which undid the vacatur of his order for want of jurisdiction to enter it and restored the *status quo ante*. *Sears II* meant that it was as though *Sears I* never happened. As long as Judge Drain's order was in effect, no one had any reason to argue that Sears had failed to meet the § 365(d)(4) deadline; the assumption and assignment were approved and that deadline was irrelevant to MOAC's challenge to the validity of those transactions. In fact, any suggestion that there was a problem under § 365(d)(4) was unimaginable.

---

[14] A ruling against them by Judge Drain would, of course, have immediately led to the playing out of the counterfactual, with a week to go on the § 365(d)(4) clock by virtue of the parties' stipulation. I hear MOAC's argument about Sears' inability to attain standalone assumption, but there is simply no way for me to know how that scenario would have played out.

Moreover, given the unusual posture of the case when it first went to the Second Circuit – with MOAC, the victor on the merits, ending up as the appellant as the result of a procedural ruling – the issue on its appeal was a narrow one (was § 363(m) non-waivable because it is jurisdictional). That was the only issue considered by the Second Circuit and the Supreme Court. Answering that question did not implicate any other section of the Code, or require any court to address whether Sears had met the § 365(d)(4) deadline or whether the MOAC Lease was even subject to that deadline. Again, in its status as appellee, Transform was obligated to respond only to MOAC's arguments – not to think of every possible ramification in the event that MOAC prevailed on appeal. *Brown*, 862 F.3d at 188; *Car Freshner Corp.*, 2021 WL 4502281, at *4.

The issue on Transform's conditional cross appeal was equally narrow – did Judge McMahon make a mistake in overturning Judge Drain's ruling that Transform was an adequate assignee of a shopping center lease? Transform could not get *Sears I* overturned by suggesting that the Lease was not a lease for purposes of § 365(d)(4), so it had no obligation to ask the court to address the matter.

I thus conclude that any looming problem with § 365(d)(4) did not ripen until *Sears I* was reinstated and the case was remanded to this court to consider the availability of any remedy. The issue could not have been considered any sooner than now. Any judicial discussion of § 365(d)(4) prior to today would have taken the form of an illegal advisory opinion.

I thus fail to see how Sears could have either forfeited or waived this argument. "[F]orfeiture is the failure to make the timely assertion of a right [and] waiver is the intentional relinquishment or abandonment of a known right." *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). Forfeiture does not apply here because, as I have discussed, there was no earlier phase in the litigation in which it would have been

necessary – or even appropriate – for Transform or Sears to assert that the Lease was not a "true lease" and thus not subject to § 365(d)(4). Nor has Sears or Transform done anything constituting an "intentional relinquishment or abandonment" of its right to assert that the Lease is not a "true lease." The stipulations upon which MOAC relies for its waiver argument concede only that § 365(b)(3) applies to the Lease. They do not disavow any argument that the Lease is not subject to § 365(d)(4).

Judicial estoppel also does not come into play here. "[J]udicial estoppel will apply if: (1) a party's later position is clearly inconsistent with its earlier position; (2) the party's former position has been adopted in some way by the court in the earlier proceeding; and (3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." *Adelphia Recovery Trust v. HSBC Bank USA, N.A.* (*In re Adelphia Recovery Trust*), 634 F.3d 678, 695-96 (2d Cir. 2011). Sears' current position that *RPI* bars the application of the § 365(d)(4) deadline to this Lease – because it the kind of "lease" that it is not a "true lease" in economic terms – is not clearly inconsistent with anything that either it or Transform argued earlier in the case. Transform was arguing that it was qualified to take an assignment of the Lease. As I have stated repeatedly, none of its arguments depended on the Lease's being subject to the § 365(d)(4) deadline; nothing in *RPI* addressed whether a "lease" that in economic substance was not a "true lease" was or was not subject to the special restrictions on assignment of shopping center tenancies. The Bankruptcy Court never expressly adopted any argument about § 365(d)(4); no one argued the point, and no court mentioned it.

MOAC is reduced to arguing that the stipulations are inconsistent with Sears' current position about *RPI* and that the court's "so ordering" the stipulation constitutes "adopting" the position that the Lease was a lease, and so was subject to § 365(d)(4). But the text of the

stipulations – especially the last stipulation – makes it clear that Transform and Sears were merely agreeing that the lease fell within the parameters of *§ 365(b)(3)* – not § 365(d)(4). Nowhere in the stipulations did Transform and Sears agree that the Lease was a lease for purposes of the latter provision in the Code. Therefore even if court approval of the stipulations constituted "adopting" a position on the "is it a lease" question – a proposition I very much doubt – Judge Drain was clearly not adopting any concession other than that the MOAC Lease was a "shopping center lease" *within the meaning of § 365(b)(3).*

The fact that the parties were stipulating only to the fact that the MOAC Lease was a lease for a limited purpose (a shopping center lease) is underscored by the language in the earlier stipulations, in which they said nothing about the Lease itself, but agreed that Mall of America is a "shopping center." Agreeing to that fact has nothing to do with § 365(d)(4) and does not constitute any sort of implicit admission that the deadline applies to the MOAC Lease. It too has only to do with the applicability of § 365(b)(3) to the transaction.

Of course, Transform might have argued that it did not need to meet the standards for shopping center assignment because *RPI* should be read to cover all of § 365; but that indubitably would have represented a significant extension of *RPI*'s quite limited holding. Transform was perfectly free to choose not to ask for the *RPI* ruling to be so extended without prejudicing its right to argue, at an appropriate time, that the precise issue decided in *RPI* controlled the applicability of § 365(d)(4) to the Mall of America Lease.

Moreover, there is certainly no reason to assume that the Second Circuit believes that any portion of § 365 other than the forfeiture provision of § 365(d)(4) would be inapplicable to a lease with economic terms like those in the Mall of America Lease. The Circuit's reasoning in *RPI* – particularly its extensive discussion of the purposes of chapter 11 and the inequity of forfeiture

given the economic realities of the underlying transaction – makes quite clear where its focus lay. That discussion has nothing to do with whether a proposed assignee could satisfy the standards for being allowed to take over a lease for space in a shopping center. This Court cannot and will not assume that the Second Circuit would extend the reasoning of *RPI* beyond the context of the forfeiture of a lease under § 365(d)(4) when the lease is not, in economic substance, a "true lease."[15]

The whole idea that anyone should have raised the issue of the § 365(d)(4) deadline at an earlier point in time is simply absurd. The only reason this deadline has become an issue in this case is because MOAC argues that vacatur of a court-approved assignment after the stipulated deadline had expired – even though the deadline was initially met – means that the Lease must be deemed forfeited. Perhaps that would be true if the terms of the Lease were different (although we have not found a case so holding).[16] But when the terms of a lease, in economic substance, give all the landlord's rights to the tenant (albeit only for a period of time), the Second Circuit has decreed that § 365(d)(4) will not be applied to work an inequitable forfeiture. As I have no reason

---

[15] The fact that a lease is not in economic substance a "true lease" does not mean that it is not some form of lease. In both *RPI* and this case, there is a tenancy – the landlord holds fee title to the facility even though it was built by the tenant, and there will come a moment (albeit in the distance future) when the tenancy will end.

[16] Of all the cases where the filing of a motion to assume "stopped the § 365(d)(4) clock," this Court has only located one case in which a motion to assume was denied after the debtor "stopped the clock" by indicating its intention to assume the lease. *See In re MP Investments, LLC*, No. 10-02658 (ALS), 2010 WL 7609465 (Bankr. S.D. Iowa Nov. 18, 2010). In *MP Investments*, the initial lease term was for five years with the option to extend the lease term every five years and called for a base rent of about $7,700 per month. The court found that the debtor lessee satisfied the § 365(d)(4) deadline by moving to assume the lease before the deadline had elapsed despite the court ruling on the motion after the deadline had passed. However, the court ultimately denied the assumption because the debtor failed to provide adequate assurance of future performance. The court did not discuss whether the debtor would then be given time to again seek assumption and assignment to a proper assignee, and a review of that court's docket does not indicate that the debtor later sought such assumption and assignment. No case this Court knows of discusses the implications of a court's rejection of a timely motion to assume, or assume and assign, on future attempts to assume or assign the lease when the court's ruling was issued after the § 365(d)(4) deadline had elapsed. Such a case might well offer guidance about the situation facing me. If there is no such case, then this is just another way in which the Sears/MOAC/Transform mess is a unicorn – one that, one hopes, will never be seen again.

to believe the Court of Appeals would not apply the same rule in the circumstances here presented, I am not free to disregard it.

I thus conclude that *RPI* – a case limited to a very precise set of facts, which happen to be the facts of this case – dictates the outcome of "who gets the lease." I reject MOAC's argument that the Bankruptcy Code dictates a return of the Lease to it because the § 365(d)(4) deadline has passed. No legitimate bankruptcy purpose would be served by causing the Trustee to forfeit the Mall of America Lease. It remains with the estate.

## IV.   MOAC LACKS ANY MONETARY REMEDY AGAINST TRANSFORM OR SEARS

And so we turn to whether MOAC can avail itself of the alternative remedy of damages. I fail to see how.

Transform certainly cannot be held liable to MOAC in damages. It has been deprived of the Lease, which is exactly what the Code provides when a disqualified person is designated as the assignee of a shopping center lease. Taking the Lease away from Transform gave MOAC all the relief to which the Code entitles it as against Transform.

That result does not change simply because Transform and Sears have done a side deal pursuant to which Sears will make Transform economically whole despite the vacatur. The Transform-Sears agreement – which was approved by the Bankruptcy Court, apparently without objection from MOAC or anyone else – appears to have been reached in order to resolve multiple disputes that were preventing the plan from going into effect. Those disputes included, but were not limited to, disputes relating to the MOAC Lease. The Settlement kept Sears from having to litigate with Transform over how much, if any, of the purchase price under the APA needed to be refunded because of vacatur of the MOAC Lease assignment to Transform; such litigation could have delayed the distribution of estate assets to creditors for some time. If MOAC thought that the

Settlement between Sears and Transform negatively impacted its rights, it could and should have objected when that deal was presented for court approval.

The real question is whether MOAC has any remedy in damages against Sears, in the person of the Liquidating Trustee, on the theory that the proceeds of the now-vacated assignment can be found in the bankruptcy estate. The answer, I fear, is no.

The Sears chapter 11 plan, which was adopted by the court in October 2019 and went into effect in October 2022, contains an exculpation clause and an injunction that bars all parties to the bankruptcy from pursuing claims that would interfere with the consummation or implementation of the Plan, from collecting any award against the Debtor or the Trust, and from proceeding in any manner that does not comply with the provisions of the Plan. (Bankr. Dkt. No. 5370-1 § 15.8(a)-(b)). "A confirmed plan holds the status of a binding contract as between the debtor and its creditors." *Charter Asset Corp. v. Victory Mkts., Inc.* (*In re Victory Mkts., Inc.*), 221 B.R. 298, 303 (B.A.P. 2d Cir. 1998). MOAC, like everyone else with a claim against the Sears Estate, released Sears and any other Exculpated Party from all claims "for conduct occurring on or after the Commencement Date [of the Sears bankruptcy] in connection with or arising out of the filing and administration of the Chapter 11 cases, including the [APA] . . . except for acts that constitute fraud, gross negligence, criminal misconduct or willful misconduct." (Bankr. Dkt. No. 5370-1 § 15.10). As the Bankruptcy Court authorized the assumption and assignment in the first instance, there is not the slightest possibility that Sears or the Trustee could be found to have committed fraud, gross negligence or any sort of criminal or willful misconduct in connection therewith. The very purpose of an exculpation clause is to protect "court-supervised and court-approved transactions." *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019).

MOAC argues that the Exculpation Clause does not apply against the SRZ Liquidating Trust because the Trust is not an "Exculpated Party" as defined in the plan. I disagree with MOAC's conclusion.

The plan defines "Exculpated Party" as:

> (a) the Debtors; (b) the Creditors' Committee and each of its members in their official capacity; (c) with respect to each of the foregoing entities in clauses (a) through (b), all Related Parties; provided, that ESL Parties shall not be Exculpated Parties under the Plan. For the avoidance of doubt, each of the Debtors; post-Commencement Date directors, officers, and employees (other than the ESL Parties) shall be Exculpated Parties under the Plan."

(Bankr. Dkt. No. 5370-1 § 1.69). "Related Parties" includes, *inter alia*, an Exculpated Party's "successors or assigns." (*Id.* § 1.135).

The Plan provides that the Trust "shall not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement." (*Id.* § 10.2). However, the Liquidating Trust Agreement has a similar exculpation clause, stating:

> the Liquidating Trustee and the Trust Professionals shall be and hereby are exculpated by all Entities . . . from any and all claims, Causes Of Action and other assertions of liability arising out of or related to the discharge of their respective powers and duties conferred by the Plan, this Trust Agreement or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan . . . except for actions or omissions to act that are determined by final order of the Bankruptcy Court to have arisen out of their own respective intentional fraud, criminal conduct, gross negligence or willful misconduct.

(Bankr. Dkt. No. 10630, Ex. B § 8.4). MOAC argues that the exculpation clause in the Liquidating Trust Agreement is effective only against the Trustee, not the Liquidating Trust, and would thus allow MOAC to pursue the Trust's assets. But that is not so, because, as I have discussed, the Plan prevents all parties to the bankruptcy from pursuing claims or collecting awards *from the Trust*. (*See* Bankr. Dkt. No. 5370-1 § 15.8(b)).

Additionally, Sears and the Trustee were specifically

released and discharged . . . from any and all Causes of Action . . . relating, or in any manner arising from, in whole or in part, the Debtors, the Debtors' estates, the Plan, the filing and administration of the Chapter 11 Cases, the subject matter of, or the transactions giving rise to, any Claim or Interest that is treated in the Plan . . . the restructuring of Claims and Interests before or during the Chapter 11 cases.

(Bankr. Dkt. No. 5370-1 § 15.9(b), at 77-78).

MOAC, like every other party to the chapter 11 cases, is bound by these injunctions. *See In re Ditech Holding Corp.*, No. 19-10412 (JLG), 2021 WL 3716398, at *9 (Bankr. S.D.N.Y. Aug. 20, 2021). It did not object to their entry or seek a carve-out for claims relating to the assignment of the MOAC Lease to Transform. The court's order contains no such carve-out. Allowing MOAC to pursue a claim for money damages against the Trust would interfere with the implementation of the Plan, which allocates the assets of the bankruptcy estate among Sears' various creditors; any award to MOAC would disrupt that allocation. *Id.* at *8.

Because the Bankruptcy Court approved the Sears-Transform side agreement prior to the consummation of the Plan, entry of the injunction and effective date of the exculpation clause, that side agreement is not an exception to those provisions.

While I understand and am sympathetic to MOAC's position that if it cannot get the Lease back it should get something, I cannot agree with it. MOAC retains all the benefit of the bargain that it made with Sears in 1991. It has been protected against the assignment of the Lease to a party that is ineligible under the Code. Although that assignment was vacated, all defaults under the Lease were cured years ago and any compensation due under the Lease has been paid while this case has wended its way up through the courts and back again. None of that money needs to be paid back in light of the vacatur of the assignment.

The only thing this ruling does not give MOAC is a way out of its original bargain. But since MOAC freely made that bargain, I am hard pressed to see how MOAC has been damaged in

47

any way that money might compensate. I come back to a precept mentioned earlier: nothing was put into the Code to allow landlords to improve their position simply because a tenant declares bankruptcy. Sometimes, of course, landlords do end up in a better position thanks to bankruptcy, despite the Code's purported neutrality on that score. But there is no reason why that should be the result in this case.

I confess that the fact that Sears has agreed to make Transform whole – to give it, not other creditors of the estate, the economic benefit of the Lease, if not the Lease itself – leaves a bad taste in my mouth. But as I said, Sears and Transform apparently resolved a plethora of issues with their 2022 Settlement Agreement, and it has been approved by the Bankruptcy Court; no party to the bankruptcy (including MOAC) took an appeal therefrom. It is, therefore, none of my concern. End of story.

## CONCLUSION

In its most recent brief, the Liquidating Trustee said that this case might well turn out to be Pyrrhic victory for MOAC. I fear his assessment was correct. It is scant comfort that MOAC's battle has eliminated from the books an obviously erroneous outlier ruling by our Court of Appeals; recapture of the tenancy, not improvement to bankruptcy jurisprudence, was its goal. But I can see no way around *RPI*; and unless the Second Circuit (where I am sure this case is headed yet again) thinks I am wrong about the issues of forfeiture, waiver or estoppel, no legitimate bankruptcy purpose would be served by not applying the *RPI* rule in this case.

As such, the Lease is to return to the possession of the Sears Liquidating Trustee and MOAC's appeal to this Court is dismissed as moot for lack of any remedy.

This constitutes the decision and order of the court.

This is a written opinion.

Dated: May 3, 2024

_____

U.S.D.J.

BY ECF TO ALL COUNSEL