UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

IN RE SEARS HOLDINGS CORPORATION,
ET AL.,

                Debtor

---------------------------------------------------------------x

MOAC MALL HOLDINGS LLC,                        19 Civ. 9140 (CM)

                Appellant,

    -against-

TRANSFORM HOLDCO LLC, and
SEARS HOLDINGS CORPORATION,

                Appellees.

---------------------------------------------------------------x

**DECISION AND ORDER DENYING THE MOTIONS OF SRZ LIQUIDATING
TRUST AND TRANSFORM HOLDCO TO ENFORCE MOAC'S LIABILITY ON THE
APPEAL BOND AND FOR JUDGMENT IN EXCESS OF THE BOND**

McMahon, J.:

In what I earnestly hope will be the final chapter in the long-running litigation over the fate

of the former Sears store at the Mall of American in Minneapolis, the SRZ Liquidating Trust (the

Trust), as successor in interest to Debtor Sears Holdings Corporation, and Transform Holdco LLC

(Transform) have moved to enforce liability on the $2.5 million bond that was posted as a condition

of a stay pending an appeal by MOAC Mall Holdings LLC (MOAC) from this court's order, dated

May 29, 2024, *see* Dkt. No. 95. The order appealed from awarded the Sears Master Lease to the

Trust rather than to MOAC. MOAC took an unsuccessful appeal from that order to the United

States Court of Appeals for the Second Circuit, and then sought certiorari in the United States

1

Supreme Court, which was denied. The stay was ordered on May 29, 2024 and was in effect until April 28, 2025, when the Supreme Court denied certiorari and the stay pending appeal expired.

As is customary in this case, the parties have squabbled endlessly, and the motion has taken far too long to become ripe for decision (it was made on June 3, 2025, but was not fully briefed until February of this year).

The motion is decided as follows:

1.  To the extent any aspect of the motion is made on behalf of Transform, it is DENIED. Transform is not a party to the Master Lease, is not entitled to security under the bond, and lacks standing to seek relief from this court. Any rights Transform may have lie against the Trust – not against MOAC or the supersedeas bond.

2.  The Trust's motion for judgment on the bond is DENIED.

3.  The Trust's motion for judgment in excess of the bond is DENIED.

### Relevant Background Facts

The convoluted tale that lies behind this motion is not easily told – nor, frankly, do I wish to retell it. I refer the reader to this court's decision and order dated May 3, 2024 (Dkt. No. 82) for a full recounting of the tortured history of this case. For the convenience of the reader, I will list here the principal facts relevant to the motions decided here:

1.  Sears filed a petition in bankruptcy on October 15, 2018. Among its many creditors was its landlord at the Mall of America in Minneapolis, MOAC.

2.  The Sears Lease at Mall of America (the "Master Lease") was a uniquely valuable estate asset, because it was extraordinarily favorable to the tenant. Unusually for a shopping center lease, the Master Lease gave MOAC, as landlord, virtually no ability whatever to control how the space would be used – for 100 years! Therefore, while the Debtor (and its successor in interest, the

2

Trust) had every incentive to monetize the Master Lease for the benefit of the estate, MOAC had an equal incentive to see the lease cancelled pursuant to 11 U.S.C. § 365(d)(4). Cancellation of the Master Lease would have ended Sears' obligation to make any payments thereinunder, while returning control over the space to the landlord three quarters of a century before that would otherwise have been the case.

3.      In September 2019, the Bankruptcy Court approved the assignment of the Master Lease to Transform (in the person of a subsidiary, Transform Leaseco). Transform did not intend to occupy the Sears store, but planned to sublease the space to others. It expected to be able to do so without interference from MOAC, thanks to the uniquely pro-tenant terms of the Master Lease.

4.      MOAC, which desperately wanted the space rented by another "big box" store, unsuccessfully tried to persuade Judge Drain that the Master Lease could not be assigned to Transform, because Transform's financial condition was not "substantially similar" to that of Sears in 1991, when the original lease was signed – a requirement for assignment of a "shopping center lease" under 11 U.S.C. § 365(b)(3)(A).  Judge Drain overruled MOAC's objection and approved the assignment. He concluded that Transform met the requirements for assignment of a shopping center lease, despite expressly finding that Transform's financial condition was not substantially similar to that of Sears in 1991. MOAC took an appeal to this court from Judge Drain's order.

5.      On February 27, 2020, this court overturned Judge Drain's order, on the ground that the statutory requirements for assignment of a shopping center lease were clear and unambiguous, had admittedly not been met, and could not be overridden by judicial fiat. (Dkt. No. 26) (the Original Order).  Transform and the Debtor took an appeal from the Original Order.

6.      On May 11, 2020, this court was forced (reluctantly) to vacate the Original Order, and to enter an order dismissing MOAC's appeal from Judge Drain's order as statutorily moot, for

3

a reason that is collateral to the merits of this case and has no relevance to anything presently before this court (the Second Order). MOAC took an appeal from the Second Order.

7.    Almost four years were consumed by litigation over that collateral issue, going all the way to the United States Supreme Court.[1] During that extended period, the merits of the appeal from the Original Order were not addressed by any court. Instead, the parties and the appellate courts focused on the appeal from the Second Order.

8.    When the Supreme Court finally disposed of the collateral issue – which did not happen until November 2023 – the case returned to the Second Circuit. The Court of Appeals overturned the Second Order in light of the Supreme Court's ruling and remanded the case so that I could reinstate the Original Order vacating the assignment to Transform. The Second Circuit did not at that time consider the merits of the appeal from the Original Order, and so left open the question of whether MOAC or the Trustee controlled the fate of the Master Lease.

9.    On remand from the Second Circuit, this court entered an order (Dkt. No. 82) (the Third Order) that did three things:

     (i)     reinstated the Original Order (Dkt No. 26), and vacated the assumption and assignment of the Master Lease to Transform;

     (ii)    dismissed MOAC Mall Holdings' appeal, because MOAC's sole remedy was the vacatur of the assignment to Transform, a disqualified entity— which remedy it had obtained by virtue of the vacatur of the assignment; and

     (iii)   directed that the Master Lease be returned to the Sears bankruptcy estate, in the person of the Trustee, rather than being forfeited to MOAC.

---

[1] The collateral issue is whether Section 363(m) of the Bankruptcy Code was "jurisdictional," and so could not be waived (Transform had expressly waived reliance on Section 363(m) in order to persuade Judge Drain not to enter a stay pending the appeal that resulted in the Original Order). Anyone who is interested in exploring that issue can read the Supreme Court's views on the subject at *MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288 (2023). There is no need to discuss it here.

10.    MOAC wished to take an appeal from the Third Order.  It sought a stay to prevent the Trustee from leasing the Sears space pending the disposition of that appeal.

11.    This court granted MOAC's motion for a stay pending appeal from the Third Order on May 29, 2024 (Dkt. No. 103) (the Fourth Order). The stay was conditioned on MOAC's posting a bond in the amount of $2.5 million and agreeing to seek an expedited appeal. The Trustee and Transform asked the court to reconsider and raise the amount of the bond by letter motions. Those motions were denied. (Dkt. No. 104).

12.    MOAC posted a bond in the required amount, which it obtained from Travelers. It also sought to expedite the appeal. And by the standards of this case, it succeeded – the Second Circuit affirmed this court's Third Order (which effectively affirmed the Original Order) just seven months later, on December 16, 2024 – almost five years after the Original Order vacating the assignment to Transform was entered.  (Dkt. No. 108).

13.    MOAC immediately obtained a stay of the issuance of the mandate from the Second Circuit. On the ninetieth day, it filed a petition for a writ of certiorari from the Second Circuit's affirmance of the Third Order. The Supreme Court promptly denied the petition; the stay of the issuance of the mandate expired by its terms; and the Second Circuit issued the mandate on April 28, 2025 (Dkt. No. 108).  Once the mandate issued, the stay pending appeal entered by this court in the Fourth Order automatically expired as well.

14.    While all this was going on, the Sears bankruptcy chugged along before Judge Drain. On October 15, 2019, the learned Bankruptcy Judge approved the Plan of Reorganization. On October 29, 2022, the Plan became effective, and Sears as Debtor in Possession was replaced by the Trustee.

15.     In order to settle various disputes between the Debtor and Transform prior to the Plan's Effective Date, the Trustee entered into an agreement with Transform (the Economic Benefits Agreement, or EBA). In the event that Transform ultimately did not end up with an assignment of the Master Lease, the EBA required the Trustee to give Transform the economic benefits that Transform would have obtained if it had won the litigation rather than lost it. Judge Drain approved the EBA, without any objection from MOAC or anyone else, on September 22, 2022. No appeal was taken from Judge Drain's order approving the EBA and the Sears/Transform settlement.

16.     Transform lost the battle – it did not prevail in this litigation, and the assignment of the Master Lease to it was vacated. But it won the war. The net effect of the arrangement described in the immediately preceding paragraph is that Transform – not the bankruptcy estate – will receive the economic benefit of any order directing any payment, whether on the bond or in excess of the bond. Transform is also exercising effective control over the Sears space at Mall of America.

## Facts Relevant to The Instant Motion

Against that backdrop, we turn to the motion presently before the court.

The Trustee[2] here moves both to have Travelers pay out the full amount of the bond, and to have MOAC pay damages in excess of the bond. It argues (principally in its Reply Brief) as follows:

---

[2] Transform may have won the war, but that does not give it standing to seek relief under the bond. The bond was put into place to protect the interest of the Trust – successor to the Debtor's estate and owner of the Master Lease by virtue of this court's May 3, 2024 decision. The order vacating the assignment of the Master Lease to Transform was affirmed by the Second Circuit on December 16, 2024; from and after that date Transform had no direct interest in the Lease or its fate, and so lacked standing to pursue any relief in respect of the Master Lease. Of course, I cannot pretend that Transform is not interested in the result on this motion, because the EBA, which was approved by Judge Drain on September 22, 2022, gave Transform an economic interest in whatever disposition the Trust might make of the Lease. Furthermore, I understand that Transform has paid the carrying costs under the Lease during the pendency of MOAC's

1.      In November 2021, Transform entered into a sublease for the first floor of the three-story Sears property at Mall of America. The tenant under the sublease was Primark.

2.      At the time it signed the sublease, the Master Lease was technically controlled by Transform, because vacatur of the Original Order effectively reinstated the assignment to Transform that had been approved by Judge Drain. However, Primark was aware of the pendency of this litigation and the possibility that Transform might end up not controlling the Master Lease. To guard against the possibility that it might remain endlessly in limbo, the Primark/Transform Sublease contained the following clauses:

> "Litigation Resolution" shall mean (i) a dismissal, order or decision of the District Court or the Second Circuit or other applicable court of competent jurisdiction, in any case final beyond any stay, remand, removal, rehearing, reconsideration, transfer or appeal and any further possibility of any stay, remand, removal, rehearing, reconsideration, transfer or appeal, effectively resulting in the Critical Determination, or (ii) a negotiated final settlement of the Litigation effectively resulting in the Critical Determination (a "Settlement");
>
> "Critical Determination" shall mean a binding determination between Master Landlord [MOAC] and Landlord [Transform] to the effect that (i) the Master Lease Assignment [to Transform] is fully valid and enforceable, (ii) this Lease is a valid and enforceable sublease under Master Lease (subject to all of the terms ad conditions set forth herein; (iii) this Lease constitutes a sublet as contemplated under that certain Order dated August 17, 2021 by the Second Circuit in connection with the Appeal[3], and (iv) the ROFR Resolution Date (as defined in Subsection 1.1.J below) has occurred in connection with this Lease (the foregoing items (i) through (iv) being the "Critical Issues")

---

appeal, and that it is exercising effective control over the disposition of the space. But all this is pursuant to a private (if court approved) arrangement between the Trust and Transform. It is nothing over which this court has jurisdiction. For that reason, Transform's motion is DENIED. It may look to the Trust for payment of anything it may be owed pursuant to their agreement, but even if MOAC and the bonding company owed something to the Trust (they do not), they owe Transform nothing.

[3] An August 17, 2021 order of the Second Circuit granted Transform's motion to toll the deadline for Transform to sublet until sixty days after the Second Circuit entered its decision on the appeal from the Original Order. *See* Case No. 20-1846, Dkt. No. 124.

3. Section 1.1.K set forth an Outside Contingency Date of 270 Days following the Effective Date (i.e., July 30, 2022) for the occurrence of the Litigation Resolution.

4. Obviously, the Litigation Resolution did not occur by July 30, 2022. In fact, it has never occurred; instead, courts have finally determined that the Master Lease could not lawfully be assigned to Transform, and the original assignment was declared unlawful and was vacated. There was, however, a long period after June 30, 2022 when that conclusion (first reached by this court in February 2020, when the Original Order was handed down) was in doubt. At any time from and after that date, Primark was free to walk away from the Sublease.

5. For a good long while after July 30, 2022, Primark did not walk away from its deal with Transform. This, it turns out, was a rational decision on its part. This court's vacatur of the assignment to Transform was not formally reinstated until May 3, 2024; throughout that period, the Master Lease was formally assigned to Transform. So it is not surprising that Primark – which wanted more than anything to open a facility at Mall of America as soon as possible, *see* Decl. of J. Dinkin, Dkt. No. 150 – chose not to walk away from its done deal with the party that looked like it would ultimately control the fate of the property.

6. However, Primark was not idle while the case wended its way up and down the courts; it was hedging its bets by negotiating with MOAC. MOAC – saddled with not one but two empty big box stores (the stores formerly occupied by Sears and Bloomingdale's) – had expressed an interest in doing a deal with Primark as early as January 2021. Although it sent Transform a letter indicating that it did not consider Primark to be a suitable subtenant for the Sears space (Silbert Decl. Ex. A), MOAC engaged in on-and-off (i.e., desultory) negotiations with Primark for a portion of the vacant Bloomingdale's space. Those negotiations continued after the Supreme

8

Court's November 2023 decision put the assignment of the Master Lease to Transform back in judicial limbo.

7. Once this court entered the Third Order – which finally accomplished the goal of the Original Order and vacated the assignment of the Master Lease to Transform – Transform officially lost the ability to sublease space in the old Sears store to anyone, and the Primark Lease became a nullity.

8. I entered the Fourth Order, which granted the stay pending appeal, on May 29, 2024. The Fourth Order prohibited the Trust from finalizing any sublease or otherwise monetizing the property pending resolution of MOAC's appeal from the Third Order. It did not prohibit the Trust from entering into negotiations for the rental of the space – only from finalizing any such negotiations.

9. I declined to modify that order on June 7, 2024.

10. On June 12, 2024 – a little over one month from the date on which the assignment to Transform was vacated and two weeks after entry of the stay pending appeal – Primark sent MOAC a letter of intent to enter into a lease with MOAC for the Bloomingdale's space.

11. On July 2, 2024, Primark sent Transform a letter terminating the Sublease for the Sears space. The letter assigned as the reason for termination as follows:

> Section 1.1.K [of the Sublease] set forth an Outside Contingency Date of 270 days following the Effective Date (i.e., July 30, 2022) for the occurrence of the Litigation Resolution Date. Inasmuch as the Litigation Resolution Date did not occur by the Outside Contingency Date and has not since occurred, Tenant is hereby exercising its right to terminate the Lease as provided in Section 1.1.K. Accordingly, the Lease shall terminate effective five (5) Business Days following Landlord's receipt of this notice.

Notably, this letter does not assign the stay pending appeal as the reason for termination of the Sublease. Rather, it gave as Primark's reason Transform's failure to satisfy the Litigation Resolution condition by the Outside Contingency Date, or for a very long time thereafter.

12.     Primark would have paid Transform $1,382,205 in rent for the period encompassed by the stay pending appeal had the Primark Sublease gone into effect. *See* Straebel Decl. ¶ 9.

13.     Transform entered into negotiations for a second sublease at the Sears space; the proposed subtenant was The Entertainment Center (TEC). Those negotiations began in August of 2022 and resulted in the execution of a non-binding Term Sheet on March 31, 2023. TEC would have paid $1,889,335 in rent during the period encompassed by the stay had this sublease been consummated. *See* Straebel Decl. ¶ 9. However, it was not consummated, and the Term Sheet expressly provided that "neither party will be bound unless and until both parties have executed a mutually satisfactory lease." TEC's broker, William Friedman, has averred that there were no meaningful negotiations over a sublease between TEC and Transform between the date of the Supreme Court's decision (November 23, 2023) and June 2024. After the stay was entered, Transform (ostensibly acting on behalf of the Trust, but really on behalf of itself) reopened negotiations with TEC. However, neither Transform nor the Trust provided TEC with a draft lease during the period while the stay was pending, despite repeatedly being asked to do so by TEC's representatives. That was the reason negotiations did not progress during the eleven months while the stay was in effect.

14.     During the period encompassed by the stay, the Trust was required, as the tenant under the Master Lease, to pay the carrying costs for the Sears space.[4] As required by the EBA, Transform made those payments on behalf of the Trust. The payments totaled $1,021,991.

---

[4] Under the terms of the Master Lease, the base rent to be paid by Sears was negligible; the tenant was principally responsible to pay carrying costs (taxes, utilities, insurance).

10

## Summary of Argument

*The Trustee's Argument*

On the above facts, the Trustee argues that Primark terminated the Sublease with Transform because of the stay pending appeal entered by this court on May 29, 2024. It argues that it is entitled to recover, as damages arising from the stay, the value of that lost Sublease. Transform's in-house Vice President for Portfolio Management, Zachary Straebel, testifies that the present value of the terminated sublease, based on discounted cash flow analysis, is $10,300,000. Straebel Decl. ¶ 4. Mr. Straebel's testimony on this point is admissible; he is fully qualified to conduct the discounted cash flow analysis on the basis of Transform's books and records, and to the extent his calculations might be deemed opinion, Mr. Straebel is a lay witness who is fully qualified to offer that opinion pursuant to Fed. R. Ev. 702.

In the alternative, the Trust argues that it should be awarded damages for the period during which it was not entitled to monetize the Sears Lease – which is to say, from May 29, 2024, when the stay was entered, until April 28, 2025, when the Supreme Court denied certiorari and the stay pending appeal expired (a period of eleven months). The Trustee argues that those damages should be measured as the amount of rent that the Trustee could have charged for the space during those eleven months. The Trustee offers into evidence the sublease that Transform had negotiated with Primark and the letter of intent signed by TEC for portions of the Sears space, to establish that the fair rental value for the space during the period encompassed by the stay was  $3,271,641.[5] Recovery of this sum – whether denominated as rent or as use and occupancy – would more than

---

[5] This is the sum of $1,382,205 in rent from Primark under the Sublease and $1,889,435 from the Entertainment Center under a separate sublease. The Trustee has withdrawn any claim for damages measured by the fair market value of the Entertainment Center sublease (see Trustee's Reply Memorandum, Dkt. No. 189, n.2). However, the Trustee still relies on the rent that it could have collected under that sublease as the best estimate of what it lost on the portion of the Sears space that would have been occupied by the Entertainment Center during the period when the stay was in effect and it was unable to market the property.

11

compensate the Trustee (and Transform) for payment of the carrying costs for the space during the pendency of the stay, which were $1,021,991.

Under either measure of damages proposed by the Trustee, the amount of damages exceeds the amount of the bond – by $7.8 million if the damages are measured as the value of the lost Primark sublease, and by $771,641 if the damages are measured by the lost rent/use and occupancy. The Trustee argues that MOAC should bear any amount in excess of the bond that is properly found as damages attributable to the stay.

*MOAC's Argument*

MOAC argues that the Trustee is owed no damages, for four reasons:

*First*, the Trust did not incur any damages. Because of the EBA, the proceeds from the Primark sublease would have benefitted Transform, not the Trust. And per the EBA, Transform, not the Trust, was responsible to pay the carrying costs on the property during the pendency of the stay.

*Second*, the Trust can recover no damages because there was no diminution in the value of the Master Lease during the pendency of the stay.

*Third*, the Trust has failed to prove that the stay was the proximate cause of the alleged damages from termination of the Primark sublease; that sublease was terminated because Transform lost the lawsuit and Primark got tired of waiting for a more favorable result, not because of the stay pending appeal. MOAC also demands an evidentiary hearing if the court predicates damages on the present value of the Primark sublease.

*Fourth,* MOAC would never have consented to the Primark sublease, so any benefits from that sublease were illusory.

MOAC also insists that the bond caps any damages that can be awarded to the Trustee.

12

## Conclusions

Fed. R. Civ. P. 62(b) provides, "At any time after judgment is entered, a party may obtain a stay by providing a bond or other security." Fed. R. Civ. P. 62(b). As one court has explained, "a supersedeas bond provides compensation for those injuries which can be said to be the 'natural and proximate result of the stay.'" *Moore v. Townsend*, 577 F.2d 424, 427 (7th Cir. 1978) (quoting *Weiner v. 222 East Chestnut Corp.*, 303 F.2d 630, 634 (7th Cir. 1962)).

That limitation is crucial. The bond does not insure against every adverse consequence of litigation delay; it secures only those losses that are shown to be the "natural and proximate result of the stay" itself. Where the claimed injury takes the form of allegedly lost future income, the ordinary rules limiting recovery of speculative damages apply with full force. Under New York law,[6] "the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes." *Kenford Co. v. Erie County*, 67 N.Y.2d 257, 261 (1986). In a different context, the Second Circuit has likewise observed that "the loss of a future business opportunity is not a protectible property interest." *Asbestec Constr. Servs., Inc. v. U.S. E.P.A.*, 849 F.2d 765, 770 (2d Cir. 1988). That observation does not control the damages analysis here, but it underscores the settled reluctance to treat contingent, unconsummated business opportunities as concrete losses.

In light of these principles, I reach the following conclusions:

*First,* the existence of the EBA undoubtedly means that the Trust would have to pay Transform any money it might recover. But MOAC is incorrect when it argues that the Trust could not obtain an award of damages if it were proved that those damages are attributable to the stay

---

[6] To the extent the court looks to New York law, it does so only for general damages principles and for the definition of concepts such as "use and occupancy," which are grounded in state property and quasi-contract law.

pending appeal (not to the pendency of the appeal, but to the stay pending appeal – a distinction of considerable importance).

I have previously ruled, not once but twice, that the EBA – a court-approved settlement between the Trust and Transform, to which no one including MOAC objected, and from which no one including MOAC took an appeal – has nothing to do with the bond that was posted in this case. The issue for decision here is whether the Trust has proved that any damages were incurred as a result of the pendency of the stay pending appeal from the Third Order. If such damages were incurred, it is no concern of mine that any money the Trust recovers will ultimately end up in Transform's pocket. *See Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 381 (2d Cir. 2021); *Weihai Lianqiao Int'l Coop Grp. Co. v. A Base IX Co. LLC*, 799 F.Supp.3d 195, 240.

***Second,*** damages cannot be measured by the value of the lost sublease between Transform and Primark – whether that value be $10.8 million or some lesser number – because the Trust has not demonstrated that termination of the Primark Sublease was the "natural and proximate result of the stay." *Moore*, 577 F.2d at 427 (quoting *Weiner*, 303 F.2d at 634). The pendency of the appeal may have factored into Primark's decision, but there is absolutely no evidence that the stay – as opposed to the endless dragging on of litigation, or Transform's loss of the assignment, which occurred prior to the entry of the stay – was the straw that finally broke the camel's back for Primark.

The record clearly establishes that the litigation uncertainty and the length of time that had elapsed without any Litigation Resolution factored into Primark's decision-making. Primark terminated the sublease because Transform failed to satisfy the Litigation Resolution condition by obtaining the Critical Determination. As set forth in the July 2, 2024 letter from Primark to

14

Transform (the Retail Sublease Termination Notice), Primark did not mention the stay pending appeal at all. Rather, it invoked Section 1.1.K of the sublease to justify its exercise of the right to terminate the sublease. Section 1.1.K allowed Primark to terminate the sublease if the Litigation Resolution Date did not occur by the Outside Contingency Date. Dkt. No. 156-5. Primark made clear that, "With the Outside Contingency Date having been exceeded by almost two years, [it] became fatigued waiting for the resolution of the Litigation Contingency." Decl. of J. Dinkin, Dkt. No. 172 ¶¶ 15-16. There is no evidence in the record contradicting Primark's stated reason for terminating the sublease, and I see no reason to believe Primark was being disingenuous when it said it was tired of waiting for a favorable resolution. The termination letter does not mention the stay, and no one from Primark testified that it would have hung in there while MOAC's appeal from the Third Order was pending if there were no stay pending appeal in place.

Furthermore, it was not the stay that prevented Transform from consummating its sublease with Primark; it was the fact that this court had vacated the assignment of the Master Lease to Transform, which invalidated the sublease and rendered it a nullity. If there had been no stay – if there had been no appeal – Transform and Primark could not have consummated their sublease; the Third Order rendered that sublease a nullity. Since Primark wanted to get into a space at Mall of America, and was tired of waiting for the litigation to end, it availed itself of its contractual right to walk away from the lease. The stay had nothing to do with it.

Of course, the Trust could theoretically have negotiated with Primark to take Transform's place on the sublease; it controlled the Master Lease from and after entry of the Third Order, and no term of the stay prohibited the Trust and Primark from having such discussions. But no such discussions ever occurred. And we know the reason why. The Trust's designated corporate representative, William Gallagher, confirmed that the Trust did not intend to enter into subleases

15

itself and would not be the party negotiating or executing any such arrangements. Specifically, Mr. Gallagher testified:

> Q: The Trust has no intention of entering into any subleases for the premises with any prospective subtenants, correct?
>
> A: Correct.
>
> Q: Instead, under the Economic Benefit and Operating Agreement, if there is a sublease, the Trust will assign its rights under the master lease to Transform's designee, and Transform's designee would be the party to enter into any sublease for the premises under the master lease; is that correct?
>
> A: That is my understanding.
>
> Q: Will the Trust have any involvement with the master lease at all, if and when the Trust's rights under the master lease have been assigned to Transform's designee?
>
> A: I do not believe so.

Trust Rep. Dep., 25:11–14, 29:5–9. This testimony negates any suggestion that the Trust has shown that the stay deprived *it* of any opportunity that *it,* as opposed to Transform or its designee, had to monetize the Sears space, by entering into any sublease with Primark or with anyone else.

In sum, there is no evidence that the imposition of the stay pending appeal interrupted any impending deal between the Trust and Primark.

*Third,* the payment of carrying costs (regardless of who wrote the check) is not "damages" at all, let alone damages attributable to the stay pending appeal. It is the payment of rent by a tenant to its landlord.

As I previously pointed out, the Trust is the tenant of the Sears space under the Master Lease. Like any tenant, the Trust has to pay rent; otherwise it can be evicted, which would deprive it of the lease it fought so long and hard to keep out of MOAC's hands. So the Trust had to pay the rent pending resolution of the appeal, and it had to do so whether or not there was a stay pending

16

appeal. It has to pay the rent today, when the appeal is in the rear-view mirror. Those payments are not reimbursable to the Trust, whether out of the bond or in any other fashion.

The court's June 7, 2024 holding that "Should MOAC end up with the Lease in the final analysis, those amounts will be refundable to the Trustee, and can be deducted from the bond," Dkt. No. 104 at 2, said nothing about whether the Trust could collect damages out of the bond if it won rather than lost. And win it did. MOAC did not prevail on its appeal, so it was not able to cancel the Master Lease. Had it been able to cancel the Master Lease, then the Trust would have been entitled to a refund of carrying costs incurred pending appeal. But MOAC did not prevail. The Trust's argument is disingenuous.

***Fourth,*** this court opined, at the time I entered the stay pending appeal, that the proper measure of damages to the Trust from any delay would be the diminution in the value of the Master Lease that could be attributed to the stay. That is the general rule when setting bond – courts look to whether the bond would be necessary to protect "against the diminution in the value in the property pending appeal" and "to secure the prevailing party against any loss that might be sustained as a result of an ineffectual appeal." *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 350 (S.D.N.Y. 2007). If there were any evidence to support a finding that the value of the Master Lease had diminished over those eleven months, I would award the Trust damages in that amount. But there is no such evidence.

A year ago, I noted that the market for "big box" mall space like the Sears space at Mall of America appeared to be in a process of continuous decline, and I hypothesized that a stay pending appeal might well have a negative impact on the value of the Master Lease.[7] But the record is

---

[7] As it turns out, my supposition may not be true for every mall in America. *See* The Economics (and Nostalgia) of Dead Malls, *The New York Times*, available at https://www.nytimes.com/2015/01/04/business/the-economics-and-nostalgia-of-dead-malls.html?_r=0.

17

barren of any evidence tending to show that my hypothesis was correct. To the contrary: the only evidence in the record is to the effect that the Master Lease did not decline in value by so much as one penny while the stay pending appeal was in effect. Transform's president and 30(b)(6) witness, Scott Carr, valued the Master Lease at $42.7 million in a declaration submitted to this court in May 2024 (Dkt. No. 93) and assigned exactly the same value to the Master Lease in his September 2025 Deposition. (Dkt. No. 156-15).

The Trust argues in its Reply Brief that, even if the Master Lease was worth the same amount in both May 2024 and April 2025, the value of that $42.7 million in 2025 must be discounted from the same value in 2024. In effect, the Trust argues that, while the Lease did not decline in value during the pendency of the stay, it is entitled to recover as damages an amount of money equal to the interest it would have earned had it sold the Master Lease on the day the stay was imposed and pocketed the proceeds. But there is absolutely no basis to believe that the Trust would have or could have sold the Master Lease, whether in May 2024 or in April 2025. If the value of the Master Lease did not decline during that year – and if (as I readily conclude) any suggestion that the Trust would have sold the Master Lease to a third party during that year is absolutely incredible[8] – then the Trust's inability to monetize the Master Lease by selling it while the stay was pending caused it no damage whatsoever.

*Fifth,* the Trust asks the court to award it the rent that it could have collected had it been able to monetize its leasehold while the stay was in effect. But it cannot recover such damages

---

[8] For one thing, the Trust would have had to give MOAC a right of first refusal if it decided to sell the Master Lease. One of the few rights MOAC had under the Master Lease and the accompanying Amended and Restated Reciprocal Easement and Operating Agreement ("REA") was the right to match any bona fide offer for all or part of the Sears space from and after 2007. See Master Lease at §6.3. The relevant provision of the Master Lease can be found in the record on the original appeal to this court – the appeal that resulted in the Original Order – at APX 2218. It is referenced in this court's original February 2020 decision at page 7 (Dkt. No. 26-1). After living through this litigation for six and one half years, there is one thing of which I am absolutely certain: the Trust (and Transform, its puppeteer) would never do anything that might allow MOAC to get its hands on the Master Lease.

18

unless it demonstrates both that the claimed losses were the "natural and proximate result of the stay," *Moore*, 577 F.2d at 427, and that they are not "speculative, possible or imaginary," but instead "reasonably certain and directly traceable" to the stay. *Kenford*, 67 N.Y.2d at 261. It can satisfy neither standard.

In *Matter of Theatre Holding Corp.*, 22 B.R. 884, 885–86 (Bankr. S.D.N.Y. 1982), the bankruptcy court ordered the Debtor (Theatre Holding Corp.) to assume or reject its unexpired lease with the landlords by a certain date. The debtors filed an appeal and obtained a bonded stay pending appeal, but were unable to recover "rent" allegedly lost during the period encompassed by the stay. But because the Debtor failed to meet the court-ordered deadline for assuming or rejecting the lease, the lease was deemed rejected as of August 3, 1981, and the Debtor ceased owing any rent on the space from and after that date. Because no rent was owed during the period encompassed by the stay, the landlord could not look to the supersedeas bond to recover unpaid rent.

In this case, as in *Theatre Holdings,* the Trust lost no rent due to the pendency of the stay. On the date the stay was entered – May 29, 2024 – no tenant owed either the Trust or Transform any rent for any portion of the Sears space at Mall of America. And on the facts of this case – discussed exhaustively above – no one would have become liable to pay rent while the stay was pending. Therefore, the Trust has not proven any "direct connection . . . between the delay in [the Trust's] recovering the premises during the appeal and" the loss of any rental income. *Id.* at 888. That being so, the Trust cannot recover "lost rent" out of the bond.

The Trust cannot recover "lost rent" attributable to Primark because the Primark sublease was not in effect during the pendency of the stay, so the Trust was not prevented from collecting rent from Primark as a result of the stay. At no point during the pendency of the stay did Primark

19

owe the Trust any rent. The sublease was not in effect on the day the stay was entered, and Primark exercised its right to terminate the sublease on July 2, 2024. As we have discussed in the context of the Trust's claim for the lost value of the Primark sublease, there is no evidence that the pendency of the stay pending appeal – as opposed to Transform's loss in the litigation (which meant that it could never satisfy the Litigation Resolution condition) or the length of time that had already passed without any Litigation Resolution – caused Primark to walk away from that deal. At the very least, the Trust has not proven that Primark walked away solely because of the delay resulting from the stay pending appeal. Unpaid rent for the premises cannot be collected out of the bond unless the landlord demonstrates that this occurred "*solely* because of the delay caused by the stay pending appeal." *Matter of Theatre Holding Corp.*, 22 B.R. at 887 (emphasis added).

As for rent that might have been paid by TEC: negotiations for that sublease never progressed past a term sheet that was signed a year and a half prior to the court's ordering a stay pending appeal. Moreover, there is no evidence that the landlord,[9] let alone subtenant TEC, was ready, willing, and able to finalize those negotiations, such that TEC might have owed the Trust rent during the period encompassed by the stay. The evidence is clear that, during the three and one half years when the assignment of the Master Lease to Transform was in effect,[10] Transform failed to move negotiations with TEC along to a point where a sublease could be signed – even a sublease that contained a litigation contingency, although it is undisputed that TEC was willing to conduct such negotiations and sign such a contingent lease. *See* Dkt. No. 174. It was not the pendency of the stay that prevented the Trust from collecting rent from TEC – TEC was perfectly

---

[9] By "landlord," I mean the Trust, but always with the understanding that Transform was calling the shots and doing the actual negotiating. As the testimony of William Gallagher, cited above, makes clear, any negotiations would have been handled by Transform – not by any representative of the Trust.

[10] That is, between the entry of the Second Order and the Supreme Court's decision.

willing to negotiate with Transform despite the pendency of the stay. Rather, it was the failure of Transform to finalize a deal with TEC that would have obligated TEC to pay rent for the space.[11] *See* Dkt. Nos. 173, 174. Any conclusion that TEC would have executed a lease and begun paying rent during the stay period would rest on speculation. The record reflects only a non-binding term sheet and unfinished negotiations. That is insufficient to support an award of damages under *Kenford*.

The Trust has not specifically asked the court to award the value of use and occupancy of the premises as an alternative to recovery of the rent it might have collected from TEC and Primark. However, in an excess of caution, the court has considered whether the Trust's evidence about the rent that would have been paid under the Primark and TEC subleases can be considered as evidence for the recovery of use and occupancy damages.

Use and occupancy is not rent. As the New York Court of Appeals explained long ago, "liability for use and occupation is not liability for rent under the lease." *People's Trust Co. v. Schultz Novelty & Sporting Goods Co.*, 244 N.Y. 14, 18 (1926). It is therefore a distinct measure of recovery – not simply another label for contractual rent that cannot otherwise be recovered.

Use and occupancy is a quasi-contractual remedy grounded in principles of unjust enrichment, which permits a landlord to recover the reasonable value of a party's actual use and possession of property in circumstances where no enforceable lease governs the relationship or where rent cannot be recovered under the lease. *See, e.g., Eighteen Assocs., LLC v. Nanjim Leasing Corp.*, 257 A.D.2d 559, 559–60 (1999); *Goldman v. Segal*, 278 A.D.2d 74, 74–75 (2000); *In re*

---

[11] For no discernable reason, Emily Minns, TEC's outside leasing counsel, withdrew her declaration, filed by MOAC in support of its position, on January 6, 2026. Dkt. No 190-4. Ms. Minns' testimony about Transform's desultory attitude and its inaction corroborates Mr. Friedman's. In the absence of any explanation, I do not accept the withdrawal of the declaration and consider it to be part of the record. Minns is an attorney, and so is well aware of what it means to submit testimony to a court under penalty of perjury. In the absence of some explanation, I have every reason to conclude that Minns' testimony was true – especially since Friedman testified to the same effect.

21

*Patient Education Media, Inc.*, 221 B.R. 97, 101–02 (Bankr. S.D.N.Y. 1998) (describing use and occupancy and administrative claims as limited to the reasonable value of the actual benefit conferred).

For this reason, use and occupancy is ordinarily measured by the reasonable value of the use actually enjoyed – not by hypothetical or anticipated rental income under an unconsummated agreement. And because it is grounded in *actual use or benefit*, recovery is generally inappropriate where the claimant cannot show that the premises were in fact occupied or that any concrete benefit was conferred during the relevant period. *See, e.g., In re Isaac Cohen Clothing Corp.*, 39 B.R. 199, 201 (Bankr. S.D.N.Y. 1984).

While use and occupancy is not the same as contractual rent, courts may look to agreed-upon rental terms as some evidence of the reasonable value of use – provided that the award does not rest on enforcing the contract itself, but on estimating the fair value of the use of the premises. *See Matter of Theatre Holding Corp.*, 22 B.R. 884, 886–87 (Bankr. S.D.N.Y. 1982). And in this case, unlike in *In re 85 Flatbush Rho Mezz LLC*, 2024 WL 2965246 (Bankr. S.D.N.Y. June 12, 2024), the Trust, as landlord, has not simply pleaded the impossibility of proving the fair value of use and occupancy while a stay was pending. It points to the amount of rent that was negotiated between Transform and Primark and TEC, the proposed subtenants, as a fair estimate of what the Trust lost by being unable to monetize the property during the pendency of the stay.

The court in *Theatre Holding* concluded that the rule applicable to recovery of lost rent from a supersedeas bond – namely, that the landlord is required to prove that the loss was due solely to the pendency of the stay – applies with equal force to recovery of use and occupancy as an alternative to rent. Clearly there can be no such proof with respect to the rent that TEC would have paid, because there was never any agreement over the terms of a lease between the Trust (or

Transform) and TEC, and the reason was Transform's desultory negotiating posture – not the pendency of the stay.  On the record before the court, any attempt to value use and occupancy by reference to the rent contemplated in the TEC term sheet would be speculative.  Moreover, because no party ever took possession of the premises or derived any benefit from the space under the proposed arrangement, there is no basis for awarding use and occupancy with respect to TEC.

Likewise, for the reasons discussed above, the Court finds no basis for awarding use and occupancy with respect to Primark.

Therefore the Trust has not proven any damages that can be charged against the bond, because it has not identified any damages that are a natural and proximate result of the stay pending appeal. For that reason, liability on the bond must be exonerated, and the Trust's motion to hold MOAC liable for damages in excess of the bond is moot.

## DIRECTION TO THE CLERK OF COURT

For the above reasons, I conclude that the Trust's motion for recovery of any damages, either under the bond or in excess of the bond, must be DENIED.  For the reasons discussed in note 2 above, Transform's motion to the same effect is DENIED as well.

The Clerk of Court is respectfully requested to remove the motions at Dkt. Nos. 110 and 115 from the court's list of open motions, and to close this case.

Liability on the Travelers Bond number 108034602 is hereby exonerated.

This constitutes the decision and order of the court. It is a written decision.

24

Dated: March 31, 2026

U.S.D.J.


BY ECF TO ALL COUNSEL